[Cite as *State v. Louis*, 2016-Ohio-7596.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 15CA3693 |
| Plaintiff-Appellee, | : | |
| v. | : | <u>DECISION AND JUDGMENT ENTRY</u> |
| EDWINA T. LOUIS, | : | **RELEASED: 10/31/16** |
| Defendant-Appellant. | : | |

<u>APPEARANCES</u>:

David A. Sams, West Jefferson, Ohio, for appellant.

Mark E. Kuhn, Scioto County Prosecuting Attorney, and Jay Willis, Scioto County Assistant Prosecuting Attorney, Portsmouth, Ohio, for appellee.

Harsha, J.

**{¶1}** After a jury convicted Edwina T. Louis of multiple offenses against her young grandchildren, the trial court sentenced Louis to four life sentences without parole, plus a total of 37 additional years, all to be served consecutively.

**{¶2}** Louis asserts that the trial court violated her constitutional right to confrontation when it admitted a detective's videotaped interview of two of her grandchildren. However, the record shows that both grandchildren testified at trial and were subject to cross-examination. The Confrontation Clause places no constraints on the use of prior testimonial statements when the declarant appears for cross-examination at trial. Therefore, the trial court's admission of the videotaped interviews did not violate the Confrontation Clause of the United States Constitution. We reject Louis's first assignment of error.

**{¶3}** Next, Louis contends that her rape convictions were against the manifest weight of the evidence because there was a dearth of evidence to establish how Louis aided and abetted the rapes. The state introduced evidence that Louis roped and chained her granddaughters to their beds for extensive periods of time and allowed Sanchez unlimited access to them with the knowledge that he had raped them on multiple occasions. The evidence showed that Louis was in the house while many of the rapes were occurring, the house was a small doublewide with no doors on the rooms, and the granddaughters' room was directly visible from the kitchen. On at least one occasion Sanchez announced at the kitchen table his intentions to anally rape one of the girls as punishment. When the granddaughters first told Louis about the rapes, she told them it would be their secret. Based on this evidence the jury properly found the essential elements of the crimes proven beyond a reasonable doubt. Because the jury did not clearly lose its way or create a manifest miscarriage of justice, we reject Louis's second assignment of error.

**{¶4}** We address her remaining assignments of error out of order to facilitate a logical flow of the analysis. In her fourth assignment of error, Louis contends that her convictions for child endangering were also against the manifest weight of the evidence. She claims that there was no evidence of serious physical harm, a requirement for a second degree felony conviction of the offense. However, the state presented evidence that the children suffered scars, rope burns and beatings that left bruises and lash wounds. They were tied up and chained to their beds for weeks. The children were also deprived of sufficient food for a prolonged period, leaving them very thin and malnourished. Based on this evidence the jury properly found the essential elements of

the crimes proven beyond a reasonable doubt. Because the jury did not clearly lose its way or create a manifest miscarriage of justice, we reject Louis's fourth assignment of error.

{¶5}   In her third assignment of error, Louis contends that the verdict forms were insufficient to allow a conviction for rape and a sentence of life without parole. The verdict forms supported the four convictions for rape. But the sentence of "life without parole" on two of the counts was contrary to law because it did not contain the requisite statutory findings for imposing that sentence, i.e. that she had a prior conviction for rape of a victim less than 13, she caused the victim serious physical harm, or that the victim was less than 10. Therefore, we affirm the trial court's judgment of conviction of rape on all four counts, but reverse and remand for resentencing on two of the four counts.

{¶6}   Next, Louis contends that the consecutive terms component of her sentence is contrary to law. However, the trial court complied with the relevant sentencing statute by making the requisite findings at the sentencing hearing and incorporating them in its sentencing entry. And the record supports the trial court's findings. We reject Louis's fifth assignment of error.

{¶7}   Last, Louis contends that consecutive terms for rape and child endangering were barred because the trial court should have merged those counts. Although the facts indicate that child endangering and rape can be allied offenses, in this instance they are crimes of dissimilar import, i.e. they were committed separately, and/or were committed with separate animus, or the harm resulting from each offense was separate and identifiable. Therefore, the trial court properly convicted and sentenced Louis for both offenses. We reject Louis's sixth assignment of error.

## I. FACTS

**{¶8}** Regrettably, our task requires a lengthy and graphic recitation of the sordid facts.

### A. Procedural Context

**{¶9}** The state charged Louis with sixteen counts of rape in violation of R.C. 2907.02(A)(1)(b), a first degree felony. Of the sixteen rape counts, six involved a child under the age of thirteen and ten involved a child under the age of ten. The state also charged her with three counts of child endangering in violation of R.C. 2919.22(B)(3) and (E)(3), a second degree felony; three counts of kidnapping in violation of R.C. 2905.01(A)(4), a first degree felony; and one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a third degree felony. The indictment alleged that the offenses occurred during periods spanning from August 2011 to March 2014. Louis entered a plea of not guilty to the charges.

**{¶10}** The state filed a motion requesting that the trial testimony of the two granddaughters be presented through close circuit television pursuant to R.C. 2945.481(C). After an evidentiary hearing on the matter, the trial court granted the motion on the grounds that the children would be unable to communicate the allegations of abuse in the presence of Louis due to extreme fear and intimidation, and there was a substantial likelihood that the children would suffer severe emotional trauma from testifying in her presence. *See* R.C. 2945.481(E)(2) and (3).

### B. Background

**{¶11}** At trial the state presented evidence that Louis lived in a small three-bedroom house with Bobbi Pack, her daughter, Pack's four children and Pack's

boyfriend, Juan Sanchez. Louis described it as two doublewides put together with no doors on any of the rooms. According to Louis, Sanchez was the father of Pack's youngest child, S.S., while Louis's own estranged husband was the father of Pack's three other children, Jm.L, Jn.L, and G.L. The latter three grandchildren are the victims of Louis's crimes.

{¶12} Pack signed a form that purportedly gave Louis power of attorney and custody of all four grandchildren. Louis used that form to enroll the children in school and to be identified as the main contact person in charge of their education. For the 2013-2014 school year, Louis removed all three school-aged grandchildren from brick and mortar schools and placed them in virtual online schools. They were in the second (G.L.), third (Jn.L.) and fifth (Jm.L) grades. Jm.L testified that Louis placed them with online schools because Louis was "mad" that teachers were asking about their bruises. Jn.L testified that she believed they attended online school because Louis was afraid the children "were going to tell everybody what was going on." Louis claimed she made the decision because of bullying, but conceded she had had problems with a school principal that "extended from part" of the principal's complaints to Children Services about marks on Jm.L.'s body.

{¶13} The criminal investigation began early in 2014. During a morning online class session, Louis's nine-year-old grandchild, Jn.L., sent a chat message to her third grade reading teacher asking the teacher for help because her family was tying her, G.L., and Jm.L to their beds, beating them, and starving them. She asked her teacher to call 9-1-1. In response to the teacher's call, Scioto County Sheriff Deputy Paula Gibson went to Louis's house to conduct "a wellbeing check" on the children.

## II. Testimony

### A. Deputy Gibson

{¶14}  Gibson, who did not have a search warrant, knocked on the trailer. Sanchez answered the door, said he would wake someone up, and then shut the door. Deputy Gibson testified she waited outside for approximately four minutes. When no one returned, she knocked again. No one returned so Gibson pounded on the door with her fist. Louis answered the door and said that the children were fine. She was reluctant to allow Gibson inside, but eventually let her in.

{¶15}  Deputy Gibson testified that when she went inside, Sanchez was sitting on the couch with S.S., the two-year old child. G.L. and Jn.L. were in chairs at the kitchen table sitting in front of computers. Gibson testified that she could see directly into the girls' bedroom from the kitchen and saw Jm.L. leave the bedroom and walk into the kitchen. The refrigerator, deep freeze, and pantry closet had padlocks on them. Louis, who had the keys to the various padlocks on a lanyard around her neck, claimed the multiple padlocks were needed to keep the two-year-old toddler out of things. Gibson had Louis remove the padlocks and saw that the locked areas were filled with food. When Gibson asked G.L. what he had to eat for breakfast, G.L. said he had not had anything.  At that, Louis yelled out, "Yes, you have. You ate oatmeal with cinnamon" and explained that G.L. has ADHD and it affects his memory. Gibson asked Louis if she could speak to the children alone but Louis said no.

{¶16}  Gibson told Louis she was going to call Scioto County Children's Services. Gibson testified that Louis became very agitated and ordered Gibson to leave. Gibson

left, called Children's Services and returned a few hours later with two Children's Services employees.

### B. Caseworker Mitchell and Nurse Harris

{¶17} Brittany Mitchell and another case worker from Scioto County Children's Services returned with Deputy Gibson. Mitchell testified that she interviewed the three children. G.L. appeared to be very, very thin and scared. He mumbled and would not speak, but then he said that he gets to be untied from his bed at night. After this statement, G.L. acted "freaked out," stopped talking, and went into the living room.

{¶18} Mitchell testified she interviewed Jm.L. next and that she also appeared extremely thin, scared, and had matted hair. Jm.L. constantly checked the bedroom doorway before answering questions and spoke very softly. In response to Mitchell's questions, Jm.L. denied being starved or tied down and explained that the markings on her neck were from a jump rope she had played with outside.

{¶19} Mitchell indicated she interviewed Jn.L., who had matted hair, was also extremely thin, and exhibited similar mannerism as Jm.L. However, Jn.L denied all allegations of abuse when asked about it by Mitchell.

{¶20} Mitchell testified she saw the padlocks on the refrigerator, freezer, and pantry. She inspected the children's beds and all three bed frames had similar wear and scratch patterns. The children told Mitchell that the cat and their two-year-old stepsister, S.S., made the wear patterns and scratches.

{¶21} Mitchell testified she conferred with her supervisor who determined that they did not have sufficient cause to seek an emergency removal order at that time. Mitchell testified that she explained to Louis and the children that Children's Services

would be working with them through an alternative program. Mitchell advised Louis that because of the children's low weight, they should be taken to a doctor for physical examinations. Mitchell told Louis that she could get Children Services to leave her alone if she took the children to the doctor. Mitchell testified that, although she did not tell Louis, she believed a doctor would substantiate her belief that the children were severely malnourished and provide evidence to support an emergency removal.

{¶22}  According to the medical records introduced at trial, Louis took the children to the doctor.  James Harris, the nurse practitioner who attended to the children, testified that Louis refused to allow the nurse to remove clothing to look at the children's bodies or perform a physical exam. Harris testified that Louis told the nurse the children were only to be weighed. The medical reports showed that G.L. had lost two pounds since his last exam two years ago and was below the 5th percentile for weight. Similarly, Jn.L. had lost three pounds since her last exam two years ago and was in the 10th percentile for weight. Jm.L. was in the 10th percentile for weight. (Ex 21). No medical cause could be found for the children's notable weight loss.

{¶23}  Mitchell indicated after she got the medical reports from the physician, she obtained an emergency order from the Scioto County Juvenile Court to remove the children. She went back to Louis's house the following day, and removed the children. Mitchell testified that as they were leaving, Louis told the children, "You don't have to show them your bodies. That's your right as a child." Mitchell testified that while she was transporting them, the children told her that things were getting better and over the weekend Louis had hired a taxi and taken them all to a restaurant where they could eat

all they wanted because they had been good and not talked to Mitchell and the other case worker.

{¶24} Mitchell indicated the children were placed in foster care and she visited them two days later on February 7th. Mitchell testified that during the course of the visit, she discovered deep indentation marks on the bodies of Jm.L. and Jn.L. After repeatedly reassuring the children that she would not tell Louis anything they told her, the children described being tied down to their beds with a rope in a five-point harness method – over shoulders, around stomach, up between the legs, and back up to the center of the body. Mitchell testified that the children told her they were only unbound to do their schoolwork. Mitchell contacted Scioto County Sheriff's Office Detective Jodi Conkel, who asked Mitchell to bring the children in for interviews the following Monday morning.

C. Detective Conkel

{¶25} Detective Conkel testified she recorded her interviews with the children. In those interviews, which the state played for the jury, Jn.L stated that Louis and Sanchez have been hurting her; that they tie all three of the children up to their beds with chains and ropes all day and do not feed them. Jn.L. said Louis told the children not to tell anyone or Louis would kill them. During the interview Jn.L. stated that Louis makes a belt wet, makes them take their clothes off and get on the deep freezer and then hits them with the wet belt. Louis tells them the more they cry, the more she will keep hitting them.

{¶26} The videotaped interviews also included Jm.L., who stated that Louis had been hurting her. With no prompting from Conkel, Jm.L. blurted out that Sanchez had

been raping her and Jn.L. and that she, Jn.L. and G.L. had told Louis about it and she "blew it off." In the interview Jm.L. described Sanchez's ejaculation and stated that Louis told her she could be pregnant. Jm.L. told Conkel that Sanchez penatrated her with his finger and penis in her private parts, that she told Louis about it, and told Louis that it had been going on since the family had lived in the Virgin Islands. When Conkel asked Jm.L. if she knew the difference between a truth and a lie, Jm.L. said she could prove Sanchez had raped her because Louis had looked at her private parts afterwards and said that her "cherry's popped." Jm.L. also told Conkel that, while doing school work at the kitchen table, Sanchez told Jm.L. that he would "F-U-C-K you in the butt" if she did not get her school work completed correctly. Jm.L. told Conkel that Sanchez had raped both her and Jn.L. vaginally and anally multiple times and that both she and Jn.L. told Louis, but her only response was, "if he does it again just bite his nuts."

{¶27}  During the interview Conkel asked Jm.L. what had caused the markings on her back. Jm.L. described how Louis tied her up so tightly with ropes in a harness style that when she woke up the next day, she was swollen like "a monster" and could not move. Jm.L. had to have Jn.L. pull down her pants to use the toilet and to hand her toilet paper because Jm.L. was so stiff and swollen that she could not reach around to do those things herself. Jm.L. said that Louis would tie her up to her bed to prevent her from getting food and sometimes make Pack tie her up. Jm.L. described how she, Jn.L. and G.L. were told to strip down naked and then beaten by Louis with belts and a wooden two-by-four, and that Louis broke a red broom stick beating Jm.L. with it. Conkel testified that she took photographs of the scarring and rope burn marks on Jm.L.'s and G.L.'s bodies.

{¶28} During the interview Jm.L. also described how Sanchez quickly cut her ropes off of her when Deputy Gibson came to the house for the wellbeing check, and after Gibson left, her family took off the chains from the children's beds.

{¶29} After Conkel concluded her interview with Jm.L., she spoke a second time with Jn.L., because Jn.L. had not initially reported being sexual abused. During the second interview, which was also played for the jury, Jn.L. told Conkel that Sanchez had vaginally and anally raped her and described white stuff coming out of Sanchez's penis. Jn.L. told Conkel she had witnessed Sanchez raping Jm.L. and Sanchez had been raping them since they lived in the Virgin Islands. Jn.L. said that she told both her mother and Louis about the rapes and that her mother was trying to help, but Louis was not.

{¶30} Conkel testified that the next day she obtained a search warrant for Louis's house and found a plastic bag with three long chains inside another plastic bag in the garbage can at the back of the house. Bedding taken from the children's beds were infested with bedbugs. Conkel testified that Louis, Pack, and Sanchez were taken into custody.

{¶31} Louis waived her *Miranda* rights and voluntarily agreed to an interview with Conkel. The state played the videotape of that interview for the jury. During the interview, Louis stated that she was aware of the rope burns but the children told her they were from playing cops and robbers. Louis also admitted to Conkel that Jm.L. and Jn.L. told her that they had been raped by Sanchez and that she had visually inspected Jm.L.'s vaginal area about three months earlier. However, Louis contended she could not really determine anything from the visual inspection of Jm.L. Louis claimed she had

very little recollection about the details of that conversation but vaguely recalled that the children were able to describe specific details about the "cracked" appearance of Sanchez's penis, who was a diabetic.

{¶32} During the interview Louis told Conkel that she did not report the rapes to the police because, "my grandkids have a bad habit of lying." Louis told Conkel that she and Pack met Sanchez when living in the Virgin Island. Louis stated that she had no fear of Sanchez and she left Sanchez alone with her grandchildren whenever she went to the store. Louis denied tying up her grandchildren and denied that she ever saw them tied up or in chains, and she claimed she fed them whenever they were hungry. Even though initially in the interview Louis claimed she did not believe her granddaughters' rape allegations, later as the interview progressed, she admitted she had little doubt in her mind that Sanchez was raping them and she was planning to eventually report the rapes to the police.

### D. The Victims' Testimony

#### (1)  Jm.L.

{¶33} Jm.L. testified that she is twelve years old and was nine years old when she moved from the Virgin Islands to Portsmouth. She testified that Louis would whip her and the other grandchildren with leather belts, the wooden two-by-four bed slats from their bed frames, tree switches, and spatulas, make them stay in their beds all day, withhold food, and make them stand with their hands out holding cans or books in their hands. If they dropped the cans, they were whipped with belts. Jm.L. testified that Louis would also hit them in the face. Louis hit her grandson G.L. so hard in the face with her fist that it knocked his tooth out; and Louis hit Jm.L. so hard on the face the impact

knocked Jm.L. to the ground. Jm.L. testified that Louis carries oxygen around; Louis told Jm.L. that she uses it while she beats them so that she can "have breath longer where she can whoop us longer."

**{¶34}** Jm.L. testified consistent with her videotaped interview that Louis tied her, Jn.L. and G.L. with ropes and then chained them with padlocks to their beds, they were fed very little and all the food in the house was kept padlocked up with the keys to the padlocks around Louis's neck. Jm.L. said Sanchez and Louis hid the ropes and chains when the police and Children's Services came. She testified that after Gibson left, Louis told the grandchildren to lie about their injuries, and to say they were eating and were not hungry. Louis told them if they lied, she would take them out to eat, but if they told the truth, no one would believe them and they would be dead before anyone would come back for them.

**{¶35}** Jm.L. testified that Sanchez had put his hands and penis in her vagina, rectum, and mouth almost every day and had been doing this since he lived with them in the Virgin Islands. Jm.L. saw him do those same things to her sister, Jn.L., and both of them had told Louis about it in November 2013. Jm.L. said sometimes the rapes would occur when Louis was home and sometimes when she was not.

**{¶36}** On cross examination Jm.L. testified that she had repeatedly told Louis about the rapes and Louis got mad at Sanchez, but said that "she was going to keep it a secret between [Jm.L., Louis, Jn.L., G.L., and Pack]." Jm.L. also testified that the belt beatings left bruises and cuts on her skin. Jm.L. testified that she was chained to her bed all day for weeks at a time and only let up to do schoolwork or use the bathroom. Jm.L. also testified that as part of the standing up punishment, if they could no longer

stand up and were caught sitting, Louis would lay them over her lap and burn their bottoms with a lighter so that they could not sit down. Jm.L. said this burn punishment occurred while in the Virgin Islands.

### (2) Jn.L.

{¶37}  Jn.L. testified that she is ten years old and was seven when she moved from the Virgin Islands to Portsmouth. Jn.L. also testified about the beatings, restraints with ropes and chains, and about Louis making her stand with her arms out to her sides holding cans for long periods of time. Jn.L. testified that they were not able to eat very often and occasionally if the necklace with the keys were left on a counter and everyone was asleep, they would sneak the key and unlock the food. However, they would get caught and beaten. Jn.L. also confirmed that when the police arrived for the wellbeing check, Sanchez ran around unlocking and cutting Jm.L. and G.L. from their chains and ropes.  Jn.L. testified she was scared to tell the truth to Gibson or Mitchell because Louis had threatened to beat them if they talked. Jn.L. also stated that Louis used oxygen when she beat the grandchildren and that Louis had told them she used the oxygen so "she could have more energy to do it."

{¶38}  Jn.L. testified that Sanchez had raped her vaginally, anally and orally almost every day and that Louis would be in the living room all the time it was going on. Jn.L. said that one time after Jn.L. told Louis about the rape, Louis visually inspected Jn.L.'s vaginal area and told her that nothing was wrong. Jn.L. also testified that Louis made her get naked, get on the deep freezer and beat her with a belt for punishment.

### E. Louis

{¶39}  At trial Louis took the stand and testified in her defense. Louis contended that she fed her grandchildren "all the time." Louis denied ever tying up her grandchildren with ropes and chains and claims she never saw anyone else do it either. Louis also repeatedly testified that the rope burns on her grandchildren were from them playing. Louis had no idea how the chains got into the trash. Louis stated that her granddaughters had told her in November 2013 that Sanchez was raping them, but she "failed" them and did not contact the authorities. Louis denied having any knowledge of the repeated rapes going on in her house, even though she testified that her house was small and there were no doors on the rooms.

{¶40}  On cross-examination Louis acknowledged that she paid the rent on the house, repeatedly denied that Sanchez lived with them and insisted that Sanchez did not move with them when they left the Virgin Islands. Louis also testified she never hit G.L. so hard that he lost a tooth and that Jm.L. was lying. And, Louis claimed that Conkel, Mitchell and Gibson were lying when they described her behavior during the wellbeing check and search of her house. Louis also claimed that the nurse was lying about the grandchildren being malnourished.

{¶41}  Louis admitted that she made her grandchildren stand for periods of time with their hands extended out, but she denied giving them cans to hold or beating them with a wet belt when they fell. In her police interview Louis had stated she was not afraid of Sanchez and allowed him to be alone with her grandchildren. However, at trial Louis testified inconsistently and claimed instead to be terrified of Sanchez, to have watched him carefully, and that she would not let him out of the front room.

F. Other Testimony

**{¶42}** Several of Louis's relatives testified that neither Louis, Sanchez or Pack were employed and that Sanchez had moved to Portsmouth with Louis from the Virgin Islands. Contrary to her version, several of Louis's relatives testified that Sanchez lived with Louis and was with her when they arrived from the Virgin Islands. An aunt testified that in January 2014 – after the granddaughters had reported the rapes to Louis – she drove Louis to get groceries and witnessed Sanchez being left behind with the grandchildren.

### III. Guilty Verdict

**{¶43}** The jury returned a verdict finding Louis guilty of four counts of rape, three counts of endangering children, and one count each of kidnapping and tampering with evidence. The trial court sentenced Louis and she appealed.

### IV. ASSIGNMENTS OF ERROR

**{¶44}** Louis assigns the following errors for our review:

I. THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT WAS VIOLATED BY THE ADMISSION OF A TAPE-RECORDED INTERVIEW OF THE CHILD VICTIMS BY A LAW ENFORCEMENT DETECTIVE.

II. THE CONVICTIONS FOR COMPLICITY TO RAPE UNDER R.C. 2907.02(A)(1)(b) AND 2923.03(A)(1-4) WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

III. THE VERDICT FORMS WERE INSUFFICIENT UNDER R.C. 2945.75 TO ALLOW A CONVICTION AND SENTENCE OF LIFE WITHOUT PAROLE FOR RAPE UNDER R.C. 2907.02(A)(1)(b).

IV. THE CONVICTIONS FOR CHILD ENDANGERING AS FELONIES OF THE SECOND DEGREE WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

V. CONSECUTIVE TERMS WERE BARRED UNDER R.C. 2929.14(C)(4).

VI. CONSECUTIVE TERMS FOR RAPE AND CHILD ENDANGERING WERE BARRED UNDER R.C. 2941.25.

## V. RIGHT TO CONFRONTATION

**{¶45}** Louis's first assignment of error asserts that because the primary purpose of the detective's interviews was testimonial in nature, rather than for diagnostic medical purposes, the trial court violated her constitutional right to confrontation when it admitted the videotaped interviews of two of her grandchildren. She argues that although the grandchildren testified at trial, their trial testimony did not contain as many details as the videotaped interview did; as a result the interviews essentially "supplanted the trial testimony".

### A. Standard of Review

**{¶46}** At trial Louis objected to the introduction of the videotaped interviews on the ground that they were inadmissible hearsay. She did not raise any objections based on the Sixth Amendment Confrontation Clause. The trial court ruled that the interviews were not hearsay under Evid.R. 801(D)(1)(b), which allows the admission of prior consistent statements that are offered to rebut an express or implied charge of recent fabrication. However, on appeal Louis does not designate the trial court's evidentiary ruling under Evid.R. 801(D)(1)(b) as an assignment of error. Instead, her assignment of error challenges the admission of the interviews on the ground that it violated her Sixth Amendment right to confrontation. Therefore, we do not review the trial court's evidentiary ruling for compliance with the Ohio Rules of Evidence. Instead we determine whether the admission of the interviews violated Louis's Sixth Amendment right to confrontation using a plain error analysis.

**{¶47}** Appellate courts take notice of plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State*

*v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus; *State v. Neal*, 4th Dist. Hocking No. 15CA1, 2016-Ohio-64, ¶ 36, *appeal not allowed*, 145 Ohio St.3d 1471, 2016-Ohio-3028, 49 N.E.3d 1314 (2016); *State v. Bethel,* 4th Dist. Jackson No. 13CA11, 2014-Ohio-3861,  ¶ 7. To prevail, Louis "must show that an error occurred, that the error was plain, and that but for the error, the outcome of the trial clearly would have been otherwise." *State v. Mammone,* 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 69. The defendant bears the burden of proof on the issue. *See State v. Cooper,* 170 Ohio App.3d 418, 2007-Ohio-1186, 867 N.E.2d 493, ¶ 31 (4th Dist.) ("The defendant carries the burden to establish the existence of plain error, unlike the situation in a claim of harmless error, where the burden lies with the state").

B. Confrontation Clause Analysis

**{¶48}**  "The Sixth Amendment's Confrontation Clause provides, 'In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *.' "  *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 34.  The Confrontation Clause of the Sixth Amendment is made applicable to the states by the Fourteenth Amendment. *State v. Issa*, 93 Ohio St.3d 49, 752 N.E.2d 904, fn. 4 (2001). Consequently, this constitutional right applies to both federal and state prosecutions.

**{¶49}** The United States Supreme Court has interpreted the Sixth Amendment right to confrontation to prohibit the admission of an out-of-court "testimonial" statement of a witness who does not appear at trial, unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. *See Maxwell* at ¶

34, citing *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). *Crawford* did not define the word "testimonial", but stated generally that the core class of statements implicated by the Confrontation Clause includes statements " 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *Crawford* at 52, quoting the amicus brief of the National Association of Criminal Defense Lawyers.

**{¶50}** The state argues that the Confrontation Clause is not implicated because: (1) both grandchildren testified at trial and were subject to cross-examination and (2) the statements made during the interviews were not "testimonial" – the primary purpose of the interviews was not to create an out-of-court substitute for trial testimony, but to enable the authorities to respond to an ongoing emergency.

**{¶51}** We need not determine whether the statements are "testimonial" because even if they are, they do not offend the Confrontation Clause. The Court in *Crawford* was explicit: "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Id.* at fn. 9, citing *California v. Green* (1970), 399 U.S. 149, 162, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *State v. Arnold*, ___ Ohio St.3d. ___, 2016-Ohio-1595, ___N.E.3d___, ¶ 66. Both of the grandchildren interviewed on videotape also testified at trial and were subject to cross-examination. The record reflects that defense counsel cross-examined them about the statements they made in their interviews. Consequently, we find no constitutional error, plain or otherwise, in the court's decision to admit the interviews. *See State v. Knauff*, 4th Dist. Adams No. 10CA900, 2011-Ohio-2725, ¶ 43. We overrule Louis's first assignment of error.

VI. Convictions for Complicity to Rape and Child Endangering

{¶52} Louis's second and fourth assignments of error assert that the convictions for rape, which were based on complicity to rape under R.C. 2907.02(A)(1)(b) and R.C. 2923.03 (A)(1) – (4), and her convictions for child endangering were against the manifest weight of the evidence. On her complicity conviction, Louis argues the victims "did not detail how appellant acted to further the sexual abuse." On her child endangering conviction, Louis argues that there was "not enough" evidence of "serious physical harm" to support a second degree felony conviction, but concedes that there was sufficient evidence to support a conviction of a lesser degree felony of child endangering. Specifically, Louis contends that "aside from sexual abuse and the broken tooth of the young boy, the physical harm caused by the beatings and constraints of the girls did not rise to a level of serious physical harm under R.C. 2901.01(A)(5)."

A. Manifest Weight of the Evidence

{¶53} In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Hunter,* 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119; *State v. Wade,* 4th Dist. Ross No. 14CA3435, 2015-Ohio-997, ¶ 29.

1. Complicity to Rape

**{¶54}** To be guilty of rape Louis had to have aided or abetted Sanchez in committing the rapes. "[T]o support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 245, 2001-Ohio-1336, 754 N.E.2d 796 (2001), quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971). "[P]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." *Id.* However, " 'the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.' " *Id.* at 243, quoting *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982). "This rule is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission." *Id.; State v. Pickett*, 4th Dist. Athens No. 15CA13, 2016-Ohio-4593, ¶ 32.

**{¶55}** The state presented evidence that Louis knew Sanchez was repeatedly raping Jm.L. and Jn.L. because both girls testified that they repeatedly told Louis about his crimes. Jm.L. testified that she told Louis in November 2013 and "we said it a lot and my grandma never did nothing." Louis provided Sanchez with a place to carry out the rapes, tied and chained Sanchez's victims, and provide Sanchez with unlimited continuous access to the victims. She was present in the home while the rapes were occurring, only yards away in a room with no doors.

{¶56}   We find that in weighing the evidence and all reasonable inferences and considering the credibility of witnesses, the jury did not clearly lose its way when it found Louis had supported and assisted Sanchez in the rapes. Nor did it lose its way when it found Louis had shared Sanchez's criminal intent by inference from her presence, companionship and conduct before, during and after the rapes. Louis was far from being just an innocent bystander in the wrong place at the wrong time. We overrule Louis's second assignment of error.

## 2.  Child Endangering

{¶57}   R.C. 2919.22(B)(3) requires that the corporal punishment or physical restraints create "a substantial risk of serious physical harm to the child." Under R.C. 2919.22(E)(3), the offense is a second degree felony "if the violation results in serious physical harm to the child involved." R.C. 2901.01(A)(5) provides:  "Serious physical harm to persons" means any of the following: (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment; (b) Any physical harm that carries a substantial risk of death; (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity; (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement; (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶58}   The record showed that all three children were tied so tightly with ropes around their necks, midsection, and back that they suffered scarring and rope burns. Jm.L. was so tightly bound at times that she suffered severe swelling to the point where

she needed assistance to use the bathroom. Additionally, the children were tied and chained to their beds continuously for weeks at a time and were only untied to attend online school or use the bathroom. There was also evidence that Louis ordered the children to strip naked and then beat them repeatedly with a wet leather belt until their skin was bruised and cut. The children were severely malnourished, weighting less in 2014 than they did in 2012.

**{¶59}** Louis acknowledges there was evidence of serious physical harm when she argues "***aside from*** and the broken tooth of the young boy", there was no evidence of serious physical harm.  In reviewing the record for evidence of serious physical harm, we do not "set aside" the evidence that Louis beat her young grandson so hard with her fist that she knocked his tooth out or that she punched her granddaughter so hard, it knocked her to the ground, or that the beatings were so physically demanding on Louis that she stopped and recharged with oxygen so she could continue.

**{¶60}** In weighing this evidence the jury did not clearly lose its way when it found that the children suffered serious physical harm. The scarring and skin burns from the restraints constituted both permanent disfigurement and temporary, serious disfigurement. The beatings the children suffered involved acute pain and substantial suffering. The inhumane physical restraints placed on the children involved prolonged pain. Persistent food deprivation that results in prolonged malnourishment is a physical harm that involves a degree of prolonged pain. We overrule Louis's fourth assignment of error.

VII. The Form of the Verdicts

**{¶61}**  For her third assignment of error Louis contends that the form of the verdicts does not allow a conviction and sentence of life without parole for rape under R.C. 2907.02(A)(1)(b). This assignment of error involves two issues: (1) did the rape verdict forms properly state the degree of the offense as required by R.C. 2945.75 and (2) are the rape sentences within the statutory range for the offense set forth on the verdict forms, i.e. are the rape sentences contrary to law.

A. Verdict Forms Support Guilty Verdicts of Rape

1. Standard of Review

**{¶62}**  Louis failed to object to the verdict forms and therefore has forfeited all but plain error. *State v. Eafford*, 132 Ohio St.3d 159, 2012-Ohio-2224, 970 N.E.2d 891, ¶ 11. The Supreme Court of Ohio has recognized error, even in the absence of an objection at trial, when a verdict form fails to comply with R.C. 2945.75(A)(2). *See Portsmouth v. Wrage*, 4th Dist. Scioto No. 08CA3237, 2009-Ohio-3390, ¶ 42, citing *State v. Pelfrey,* 112 Ohio St.3d 422, 2007–Ohio–256, 860 N.E.2d 735.

2. Analysis of Verdict Forms

**{¶63}**  Louis argues R.C. 2945.75 requires that factors enhancing a sentence beyond "a normal statutory range" must be included in the verdict form.  She contends that, although the verdict forms stated the victims' young ages, there were no aggravating factors that would have determined the applicable range for sentencing under the rape sentencing statute, R.C. 2971.03.

**{¶64}**  Four rape verdict forms are at issue:  Two for the grandchild who was under the age of thirteen but older than ten (Counts 7 and 8), and two for the grandchild who was under the age of ten (Counts 15 and 16). The verdict forms for Counts 7 and 8

read, "We the jury * * * find beyond a reasonable doubt, the defendant, Edwina Louis,

Guilty of Count 7 [/Count 8] of the indictment, Rape, a violation of Ohio Revised Code

Section 2907.02(A)(1)(b), an unclassified felony involving a child under thirteen years of

age."[1] The verdict forms for Counts 15 and 16 were similarly worded except for the age,

which stated "involving a child under ten years of age." The verdict forms did not state

any other factors such as prior convictions, use of force or threat of force, or serious

physical harm to the victims that would enhance the sentence range under R.C.

2971.03.

{¶65}  R.C. 2945.75(A)(2) states:

(A) When the presence of one or more additional elements makes an
offense one of more serious degree:

*                              *                              *

(2) A guilty verdict shall state either the degree of the offense of which the
offender is found guilty, or that such additional element or elements are
present. Otherwise, a guilty verdict constitutes a finding of guilty of the
least degree of the offense charged.


{¶66}  Louis was convicted of rape under R.C. 2907.02(A)(1)(b), a first degree

felony, which states:

(A)(1) No person shall engage in sexual conduct with another who is not
the spouse of the offender or who is the spouse of the offender but is
living separate and apart from the offender, when any of the following
applies:
*                              *                              *
 (b) The other person is less than thirteen years of age, whether or not the
offender knows the age of the other person.
*                              *                              *

(B) Whoever violates this section is guilty of rape, a felony of the first degree. * * *
Except as otherwise provided in this division, *  * *, an offender under division

---

[1] The verdict forms identified rape, which is classified as a first degree felony, as an unclassified felony.
Defendant does not designate this as an error and we do not consider it in our analysis.

(A)(1)(b) of this section shall be sentenced to a prison term or term of life imprisonment pursuant to section 2971.03 of the Revised Code.

{¶67} R.C. 2907.02 does not contain multiple degrees of rape offenses; any violation of the section is a felony of the first degree. Therefore, R.C. 2945.75(A)(2) is not applicable because it only applies when the presence of one or more additional elements makes an offense one of a more serious degree. Here, the jury found Louis guilty of four counts of rape in violation of R.C. 2907.02(A)(1)(b). Under R.C. 2907.02(B), a violation of section (A)(1)(b) can result only in a first-degree felony conviction. Because there are no aggravating elements necessary to enhance the degree of the offense charged, R.C. 2945.75(A)(2) does not apply and the jury's verdict forms were sufficient to convict Louis of first-degree felony rapes on Counts 7, 8, 15, and 16. *See State v. Jones*, 4th Dist. Adams No. 13CA960, 2013-Ohio-5889, ¶ 2, 12. We overrule this part of her third assignment of error.

B. Statutory Sentencing Range for Rape Convictions

{¶68} In the second part of her third assignment of error, Louis contends that the verdict forms were insufficient under R.C. 2945.75 to allow a sentence of life without parole for rape under R.C. 2907.02(A)(1)(b). Because R.C. 2945.75 does not address the range of sentencing, we interpret Louis's argument to be that the sentence of life without parole exceeded the statutory range allowed for rape under R.C. 2907.02(A)(1)(b) (rape convictions where the victim is under the age of thirteen).

1. Standard of Review

{¶69} When reviewing felony sentences we apply the standard of review set forth in R.C. 2953.08(G)(2). *See State v. Brewer,* 2014-Ohio-1903, 11 N.E.3d 317, ¶ 33

(4th Dist.) ("we join the growing number of appellate districts that have abandoned the

*Kalish* plurality's second-step abuse-of-discretion standard of review; when the General

Assembly reenacted R.C. 2953.08(G)(2), it expressly stated that '[t]he appellate court's

standard of review is not whether the sentencing court abused its discretion' "). R.C.

2953.08(G)(2) specifies that an appellate court may increase, reduce, modify, or vacate

and remand a challenged felony sentence if the court clearly and convincingly finds that

"the record does not support the sentencing court's findings" under the specified

statutory provisions or "the sentence is otherwise contrary to law." *See State v. Neal*,

4th Dist. Hocking No. 15CA1, 2016-Ohio-64, ¶ 55, *appeal not allowed,* 145 Ohio St.3d

1471, 2016-Ohio-3028, 49 N.E.3d 1314 (2016). Again, as with the verdict forms, Louis

failed to object at her sentencing hearing and therefore has forfeited all but plain error.

### 2. Legal Analysis of the Life without Parole Sentences

**{¶70}**  The range of sentences that may be imposed for a rape conviction under

R.C. 2907.02(A)(1)(b) are set forth in R.C. 2907.02(B) and R.C. 2971.03.  Under R.C.

2907.02(B) the court may impose a sentence of life without parole if the victim is less

than ten years of age; no additional factors need to exist:

> Except as otherwise provided in this division, * * * an offender under division (A)(1)(b) of this section shall be sentenced to a prison term or term of life imprisonment pursuant to [R.C. 2971.03]. * * * *if the victim under division (A)(1)(b) of this section is less than ten years of age, in lieu of sentencing the offender to a prison term or term of life imprisonment pursuant to [R.C. 2971.03], the court may impose upon the offender a term of life without parole.* If the court imposes a term of life without parole pursuant to this division, [R.C. 2971.03(F)] applies, and the offender automatically is classified a tier III sex offender/child-victim offender, as described in that division. (Emphasis added.)

**{¶71}**  One of the two grandchildren Louis raped was less than ten years of age.

The verdict forms for the two counts of rape involving this young victim (Counts 15 and

16) each read, "We the jury, having been duly impaneled find beyond a reasonable doubt, the defendant, Edwina Louis, Guilty of Count * * * [15 and 16] of the Indictment, Rape, a violation of Ohio Revised Code Section 2907.02(A)(1)(b), an unclassified felony involving a child under ten years of age." The verdict form did not specify the degree of the offense, but the statute categorizes it as a first degree felony. Factors, such as the young age of the victim, do not change the degree of the felony, but they can change the sentence imposed. Because the victim of the rapes charged in Counts 15 and 16 was under ten years of age, the trial court can impose a term of life without parole as stated in R.C. 2907.02(B). Therefore, the trial court did not commit any error in sentencing Louis to two terms of life without parole on the rape convictions for Counts 15 and 16.

{¶72} The other grandchild Louis raped was older than ten but younger than thirteen years of age. Louis contends that she could not be sentenced to life without parole for the rape of this grandchild because the victim was not less than ten years old at the time of the rapes and there were no "aggravating factors under the statute stated which would have otherwise determined the specific applicable range of R.C. 2971.03."

{¶73} Louis was convicted under R.C. 2907.02(A)(1)(b) for the rape of a person under age of thirteen (Counts 7 and 8) and is guilty of two first-degree felonies on those counts. The sentences for these two convictions are governed by R.C. 2907.02(B) and R.C. 2971.03. The former provides:

> * * * Except as otherwise provided in this division, * * * an offender under division (A)(1)(b) of this section shall be sentenced to a prison term or a term of life imprisonment pursuant to [R.C. 2971.03]. * * * *If an offender under division (A)(1)(b) of this section previously has been convicted or pleaded guilty to violating division (A)(1)(b) of this section or to violating an*

*existing or former law of this state, another state, or the United States that
is substantially similar to division (A)(1)(b) of this section, if the offender
during or immediately after the commission of the offense caused serious
physical harm to the victim, or if the victim under division (A)(1)(b) of this
section is less than ten years of age, in lieu of sentencing the offender to a
prison term or term of life imprisonment pursuant to [R.C. 2971. 03], the
court may impose upon the offender a term of life imprisonment without
parole.* (Emphasis added.) R.C. 2907.07(B)

**{¶74}** Thus a defendant may only be sentenced to life without parole under R.C.

2907.02(B) if convicted of violating R.C. 2907.02(A)(1)(b) and one of the following

applies: (1) the defendant was previously convicted or pleaded guilty to raping a person

under the age of 13; (2) the defendant caused serious physical harm to the victim, who

was less than 13 years of age, during or immediately after the rape; or (3) the defendant

raped a victim who was less than ten years of age. If none of the above apply, the

defendant must be sentenced in accordance with R.C. 2971.03 to a prison term or a

term of life. Because none of these additional factors apply to the rapes in Counts 7 and

8, the sentence on those counts must comply with R.C. 2971.03, which provides for a

maximum sentence of life imprisonment. Unlike R.C. 2907.02(B), there is no provision

for a sentence of life imprisonment without parole.

**{¶75}** R.C. 2971.03(B)(1) states:

[I]f a person is convicted of or pleads guilty to a violation of [R.C.
2907.02(A)(1)(b) ] * * * and if the court does not impose a sentence of life
without parole when authorized pursuant to [R.C. 2907.02(B) ], the court
shall impose upon the person an indefinite prison term consisting of one of
the following:

(a) Except as otherwise required in division (B)(1)(b) or (c) of this section,
a minimum term of ten years and a maximum term of life imprisonment.

(b) If the victim was less than ten years of age, a minimum term of fifteen
years and a maximum of life imprisonment.

(c) If the offender purposely compels the victim to submit by force or threat of force, or if the offender previously has been convicted of or pleaded guilty to violating [R.C. 2907.02(A)(1)(b) ] or to violating an existing or former law of this state, another state, or the United States that is substantially similar to [R.C. 2907.02(A)(1)(b) ], or if the offender during or immediately after the commission of the offense caused serious physical harm to the victim, a minimum term of twenty-five years and a maximum of life imprisonment.

**{¶76}** The maximum sentence a defendant may receive pursuant to R.C. 2971.03(B)(1) is always life imprisonment, but with the possibility of parole. *See Setty* at ¶ 117. Only the minimum sentence can vary depending upon (b) the age of the victim, or other aggravating factors found in (c).

**{¶77}** The indictment and the verdict forms for the rape counts involving this victim contain a specification that the victim was less than thirteen years old at the time of the offense, but do not specify that the victim was less than ten. The indictment and the verdict forms do not specify that Louis had previously been convicted or pleaded guilty to the rape of a minor under age 13, or that she caused serious physical harm to the victim during or immediately after the rapes. The verdict forms finding Louis guilty of raping the victim in Counts 7 and 8 were general verdict forms finding Louis "Guilty of Count 7 [and 8] of the indictment, Rape, in violation of Ohio Revised Code Section 2907.02(A)(1)(b), an unclassified felony involving a child under thirteen years of age." Because there was no specific finding of force or threat of force, a prior conviction or serious physical harm, the sentencing range in R.C. 2971.03(B)(1)(a) applies and is "a minimum term of ten years and a maximum term of life imprisonment." Although the maximum term allowable was "life imprisonment," the trial court imposed a sentence of "life without parole" on Counts 7 and 8.

{¶78} The jury did find that Louis caused "serious physical harm" to this victim and the other two grandchildren when it found Louis guilty of endangering children (Counts 17, 18 and 19). Unfortunately here, however, the finding of serious physical harm on the endangering children counts cannot be imputed to the rape counts. "It is well established that each count of an indictment charges a complete offense; the separate counts of an indictment are not interdependent but are, and necessarily must be, each complete in itself." *State v. Setty*, 12th Dist. Clermont Nos. CA2013–06–049, CA2013–06–050, 2014-Ohio-2340, ¶ 120, quoting *State v. Curran*, 166 Ohio App.3d 206, 2006–Ohio–773, ¶ 24 (2d Dist.), citing *State v. Lovejoy*, 79 Ohio St.3d 440, 446 (1997). "A verdict responding to a designated count will be construed in the light of the count designated, and no other." *Setty,* quoting *Browning v. State*, 120 Ohio St. 62 (1929), paragraph four of the syllabus. The fact that the jury found Louis had caused "serious physical harm" in the course of committing a second degree felony of endangering children does not mean that the jury would have found that Louis caused "serious physical harm" during or immediately after the commission of the rapes.

{¶79} Because the jury did not specifically find Louis had a prior substantially similar rape conviction or caused serious physical harm during or immediately after the commission of the rapes, or the victim was less than ten, the trial court could not sentence her to life without parole pursuant to R.C. 2907.02(B) on Counts 7 and 8. *See Alleyne v. U.S.,* __ U.S. __, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013) ("Any fact that, by law, increases the penalty for a crime is an "element" that must be submitted to the jury and found beyond a reasonable doubt."); *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) ("any fact that increases the penalty for a crime

beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt").

{¶80} Although a sentence of "life imprisonment" was available on Counts 7 and 8, the sentence of "life without parole" on these two counts was contrary to law and amounts to plain error. In its brief, the state concedes this error. This portion of Louis's third assignment of error has merit. We sustain Louis's third assignment of error to the extent the trial court erred in sentencing appellant to "life without parole" on Counts 7 and 8.

### VIII. Consecutive Sentences

### A. Standard of Review

{¶81} Louis argues that consecutive sentences were not justified because the type of extraordinary harm contemplated in R.C. 2929.14(C)(4)(b) did not exist. Louis did not raise this issue during the proceedings below so she again forfeited all but plain error. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 152.

### B. Legal Analysis

{¶82} Under the tripartite procedure set forth in R.C. 2929.14(C)(4), prior to imposing consecutive sentences the trial court had to find that: (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) as applicable here, at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more multiple offenses was so great or unusual that no single prison term for any of the offenses committed adequately

reflects the seriousness of the offender's conduct. *See State v. Baker,* 4th Dist. Athens No. 13CA18, 2014-Ohio-1967, ¶ 36. The trial court "is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into the sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell,* 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus. The trial court here complied with R.C. 2929.14(C)(4) by making the requisite findings at the sentencing hearing, and incorporating them in its sentencing entry.

**{¶83}** And notwithstanding Louis's claims to the contrary, the record supports the trial court's findings concerning the harm contemplated under R.C. 2929.14(C)(4)(b) ("the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct"). Louis is the young victims' grandmother and a primary caregiver. Yet she brutally beat and starved them and kept them continuously roped down and chained to their beds. Punishment was in fact torture, with Louis forcing them to stand hands extended for hours then beating or burning them when they fell or dropped. The record supports the trial court's imposition of consecutive sentences.

**{¶84}** Accordingly, there was no error at all, let alone plain error. We overrule Louis's fifth assignment of error.

IX. Merger of Rape and Child Endangering Offenses

A. Standard of Review

**{¶85}** In her sixth assignment of error Louis contends that the child endangering counts for two of the three grandchildren should merge into the rape counts for those

two grandchildren under R.C. 2941.25(A) "because" the sexual abuse was the predicate

for the child endangering charges * * *." Louis did not raise this issue during the

proceedings below so she again forfeited all but plain error.

{¶86} The state responds that sexual abuse was not the predicate for the child

endangering charges. The child endangering offenses were based on physical beatings,

chaining to the beds for prolonged periods of time, and deprivation of food resulting in

malnutrition. Because there was separate conduct, animus, and import, the state argues

that the child endangering offenses do not merge into the rape offenses.

### B. Legal Analysis

{¶87} The Double Jeopardy Clause of the Fifth Amendment to the United States

Constitution provides that no person shall "be subject for the same offence to be twice

put in jeopardy of life or limb," and this protection applies to Ohio citizens through the

Fourteenth Amendment and is additionally guaranteed by Article I, Section 10 of the

Ohio Constitution. This constitutional protection prohibits multiple punishments in single

trial for the same offense. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072,

23 L.Ed.2d 656 (1969), overruled on other grounds; *Alabama v. Smith,* 490 U.S. 794,

109 S.Ct. 2201, 104 L.Ed.2d 865 (1989).

{¶88} The General Assembly enacted R.C. 2941.25 to specify when multiple

punishments can be imposed:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the

indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶89}** Merger is a sentencing question, and the defendant bears the burden of establishing his entitlement to the protection of R.C. 2941.25. *State v. Washington,* 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18.

**{¶90}** Under current Ohio law courts can only impose multiple punishments in a single trial for a defendant's conduct under two situations: 1) where the charged crimes are not allied offenses, i.e. it is not possible to commit multiple crimes with the same action, *State v. Johnson,* 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061 and 2) the crimes are allied offenses but the defendant's actions have dissimilar import, i.e. the crimes were committed separately, or with a separate animus, or the resulting harm for each offense is separate and identifiable. *State v. Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, paragraph one of the syllabus.

1. Allied Offenses – Step 1

**{¶91}** Initially, we look to see if the charges Louis faced represent allied offenses. To accomplish that we must look at the defendant's conduct to determine if it was possible to both commit one offense *and* commit the other by that conduct. *Johnson* at ¶ 48. To do that we must also examine the crimes at issue. *Id.*

**{¶92}** Rape, R.C. 2907.02(A)(1)(b) provides: "(A)(1) No person shall engage in sexual conduct with another who is not he spouse of the offender *  *  * when any of the following applies: * * * (b) the other person is less than thirteen years of age, whether or not the offender knows the age of the other person."

**{¶93}** Endangering children, R.C. 2919.22(B)(3) provides: No person shall do any of the following to a child under eighteen years of age or a mentally or physically

handicapped child under twenty-one years of age: * * * (3) Administer corporal

punishment or other physical disciplinary measure, or physically restrain the child in a

cruel manner or for a prolonged period, which punishment, discipline, or restraint is

excessive under the circumstances and creates a substantial risk of serious physical

harm to the child." "Black's Law Dictionary (6th Ed.1990) 339, has defined 'corporal

punishment' as 'physical punishment * * * any kind of punishment of or inflicted on the

body.' This definition would include extremities of the body such as the head, arms and

legs." *State v. Phillips*, 5th Dist. Holmes No. 14-CA-003, 2014-Ohio-5322, ¶ 23, citing

*State v. Rogers*, 44 Ohio App.2d 289, 290, 337 N.E.2d 791, 793 (1st Dist.1975).

{¶94} Cases brought under R.C. 2919.22(B)(3), the corporal punishment

subdivision of the child endangerment statute, generally involve the physical striking of

the child's body and extremities with belts, electrical cords, fists, and other objects.

However, corporal punishment is broadly defined as any punishment inflicted on the

body and therefore in extreme instances could include rape. For example, the record

shows that Sanchez threatened sodomy as a form of punishment for incorrect

homework. Because rape can be a punishment physically inflicted on the body, we

conclude it was possible for Louis to commit the offense of rape and the offense of

endangering children under R.C. 2919.22 (B)(3) with the same conduct and they are

allied offenses.

2. Offenses of Similar Import – Step 2

{¶95} However, even though it is possible to commit all of these offenses with

the same conduct, and thus they are allied offenses, we conclude that Louis can be

separately punished for each one. Louis's conduct of rape and her conduct of

endangering children were of dissimilar import, e.g. they were committed with separate conduct, separate animus and resulted in separate, identifiable harms.

{¶96} First we note that Louis is arguing only for merger of the four rape counts involving Jm.L. and Jn.L. with the two child endangering counts for each girl. She concedes that because there are multiple victims and multiple time periods, the rape charges do not merge with each other and the child endangering count of G.L. does not merge with any other count.

{¶97} The offenses of rape that Louis committed against her two grandchildren and the two child endangering offenses committed against them were of dissimilar import, committed separately and/or with separate animus. The crimes concerned different conduct—child endangering involved physical beatings, burning with lighters, chaining to beds, and food deprivation, while the rapes involved vaginal, anal, and oral penetration. The offenses occurred at different and various times over weeks and months. Louis's animus for the rape offense was to aid and abet the rapes of her young grandchildren, while her animus for the child endangering offenses was to inflict severe pain, punishment, and malnourishment and to prevent her victims from escaping and reporting it.

{¶98} The trial court did not err in failing to merge these offenses because they were not of similar import. In the absence of any error, there obviously cannot be plain error. We overrule Louis's sixth assignment of error.

## X. CONCLUSION

{¶99} The trial court did not violate Louis's constitutional rights to confrontation by admitting the grandchildren's videotaped interview because the grandchildren

testified at trial and were subject to cross examination.  Louis's convictions for rape and

child endangering were not against the manifest weight of the evidence.  Louis's

sentence for rape of a victim under the age of ten is not contrary to law. However, we

reverse the sentence on Counts 7 and 8 and remand the matter for resentencing. On

remand, the trial court is instructed to sentence appellant on those counts in accordance

with R.C. 2907.03(B)(1), where the maximum penalty authorized under the specific

facts of this case is life imprisonment. In all other respects we affirm the sentence

imposed by the trial court.

JUDGMENT AFFIRMED IN PART,
REVERSED IN PART AND CAUSE REMANDED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED IN PART AND REVERSED IN PART and that the CAUSE IS REMANDED.  Appellant and Appellee shall split the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.  Exceptions.

McFarland, J. & Hoover, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
　　　 William H. Harsha, Judge


## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**