[Cite as *State v. Warman*, 2017-Ohio-244.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2016-02-029 |
| | : | O P I N I O N |
| - vs - | | 1/23/2017 |
| | : | |
| RYAN J. WARMAN, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2015-10-1600

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael Greer, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Christopher P. Frederick, 300 High Street, Suite 550, Hamilton, Ohio 45011, for defendant-appellant

**HENDRICKSON, J.**

{¶ 1} Defendant-appellant, Ryan Warman, appeals his conviction in the Butler County Court of Common Pleas for rape. For the reasons discussed below, we affirm Warman's conviction.

{¶ 2} At the time of the offense, KG6 and KG5, sisters, lived with their father

("Father") and stepmother in Trenton, Ohio.[1] Their mother ("Mother") had scheduled visitations with them. Mother lived with Warman in Trenton, Ohio, at her father's house.

{¶ 3} Mother worked, which sometimes required Warman to pick up KG6 and KG5 from Father's home at the beginning of Mother's visitation. As relevant to the charges involved in this case, Warman picked up the children on June 5, 2015, to begin their two-week visitation with Mother. Following the visit, KG6 revealed to Father and stepmother that Warman had showed her his penis and that she and KG5 played the "ring pop game" with Warman. After contacting police, Father and stepmother took KG6 and KG5 to the Mayerson Center, a child advocacy center located in Cincinnati Children's Hospital. There, Tracy Colliers, a social worker, interviewed both KG6 and KG5.

{¶ 4} KG6 and KG5 told Colliers about the ring pop game. KG6 said she saw Warman's "wiener" and that "he said it was a blue ring pop but it was his wiener." KG5 said that she "tasted" Warman's "wiener" lots of times. The interviews were video-recorded and were observed live by a police detective in a different room.

{¶ 5} Following the interviews, the detective asked Warman to speak with him at the police station. Warman voluntarily spoke with the police officer and waived his *Miranda* rights. Warman denied that he sexually abused the girls and denied any knowledge of the ring pop game.

{¶ 6} In October 2015, a Butler County grand jury indicted Warman on two counts of rape in violation of R.C. 2907.02(A)(1)(b), both felonies of the first degree. Count one alleged the rape of KG6. Count two alleged the rape of KG5. The case proceeded to a jury trial in January 2016.

{¶ 7} KG6 testified that Warman picked her up in a car at Father's house, where they

---

1. Six and five refer to the girls' ages.

had just received ring pops.[2] Both KG6 and KG5 were seated in the back of Warman's car, along with their four-year-old brother and a young child of Warman's.

{¶ 8} Warman stopped the car at a "gas store," parked in the back and looked around. Warman then had KG6 move up to the front of the car and they played the ring pop game. He tied one of his grey shirts around her head. She had to "duck" and then Warman put his "wiener" in her mouth.

{¶ 9} When asked to describe what "duck" meant, KG6 indicated by bending. She said when she bent over she was close to Warman's pants. Warman told her to "twirl all around" his penis with her tongue, which she did.

{¶ 10} KG6 testified that Warman then attempted to get KG5 to play the ring pop game. He tied Mother's orange shirt around KG5's head. But KG5 would not "duck." So Warman returned to KG6 and put his penis in her mouth again. Warman told KG6 not to tell anyone about the game. They then drove to Warman's mother's house.

{¶ 11} KG5 testified that she watched KG6 and Warman play the ring pop game. It happened at the "parking store" while she ate a ring pop and watched. According to KG5, Warman tied a shirt around KG6's face, put his "wiener" in KG6's mouth and used his hand to "bump" KG6's head "up and down, up and down." KG5 denied that she played the ring pop game.

{¶ 12} Colliers testified concerning her interviews of KG6 and KG5 at the Mayerson Center. During her testimony, and over defense counsel's objection, the state was permitted to play the video of the KG6 interview in its entirety. During the interview, KG6 told Colliers that she played the ring pop game with Warman at a "drive thru." She said that Warman tried to play the game with KG5. Warman put a shirt around her eyes but she could see his

2. Ring pops are suckers with the candy portion attached to a plastic ring that can be worn by a child as if they are wearing ring jewelry.

"wiener" through a "line on the bottom." Warman told her to "duck." He also told her "it was a blue ring pop but it was his wiener." Warman told her to "taste something off his wiener." It was food but she could not recall what it was. Then she recalled it was "chips."[3]

{¶ 13} During Colliers' cross-examination, defense counsel played the KG5 interview video.[4] In the interview, KG5 told Colliers that she "tasted" Warman's wiener "a lot of times." She also stated that she "tasted food and someone's wiener."

{¶ 14} Father and stepmother testified next. According to the couple, Warman picked up KG6 and KG5 from their home on June 5, 2015. The girls returned on or around June 21. On July 6, 2015, one of the children in the household told stepmother that KG6 was asking her younger brother to show her his penis. When confronted, KG6 told stepmother that Warman showed her his penis so she thought it was okay. She then told them about the ring pop game.

{¶ 15} At the close of the state's evidence, Warman moved for acquittal under Crim.R. 29. With respect to counts one and two, defense counsel argued that the state failed to present sufficient proof of venue in Butler County. With respect to count two (the alleged rape of KG5), counsel argued that the state failed to present sufficient evidence that a rape occurred. The court overruled the motion.

{¶ 16} Warman's parents testified in his case in chief. They live on the east side of Middletown, Butler County, Ohio. Warman's mother said she saw Warman, KG6, and KG5 at around 9:00 p.m. on June 5 and that neither child appeared distraught. Warman's mother stated that she had never observed Warman behave inappropriately around children and that he treated KG6 and KG5 as if they were his own.

---

3. There is no transcription of the video in the record and the quality of the audio makes it difficult to discern precisely whether KG6 said "chips" or something else.

4. Defense counsel specifically moved to admit the video as an exception to hearsay pursuant to Evid.R. 803(4), despite having argued that KG6 video was inadmissible under the same rule.

{¶ 17}   Warman then took the stand and stated that he picked up KG6 and KG5 from Father's home because Mother was at work.  He stated that the children were eating ring pops when he arrived.  According to Warman, he took the children to four locations after leaving Father's home.  First, they went to a park in Trenton where the children played for an hour. Then they went to a restaurant called Checkers and had ice cream.  After that, they went to Jacot Park in Middletown.  Finally, he took them briefly to his parents' house in Middletown before returning to Mother's home in Trenton.  Warman denied raping KG6 and KG5.

{¶ 18}   The jury convicted Warman of count one, the rape of KG6.  The jury found Warman not guilty of the alleged rape of KG5.  The court sentenced Warman to an indefinite prison term of fifteen years to life.

{¶ 19}   Warman assigns four errors for our review.

{¶ 20}   Assignment of Error No. 1

{¶ 21}   THE TRIAL COURT VIOLATED MR. WARMAN'S RIGHTS TO DUE PROCESS AND FAIR TRIAL WHEN IT OVERRULED HIS JUDGEMENT FOR ACQUITTAL UNDER CRIMINAL RULE 29.

{¶ 22}   Even though the jury found him not guilty of count two, i.e., the alleged rape of KG5, Warman argues that the court erred in overruling his Crim.R. 29 motion for acquittal. Warman argues that rational jurors could not have concluded that he was guilty of raping KG5 because KG5 testified that she did not play the ring pop game.  Furthermore, Warman argues that allowing the jury to consider count two prejudiced him with respect to his conviction for the rape of KG6.  Finally, Warman argues that the state failed to prove venue. We address each argument in turn.

## Sufficiency of the Evidence

{¶ 23}   Appellate review of the denial of a Crim.R. 29 motion requires a sufficiency of

the evidence review.  We examine the evidence admitted at trial to determine whether such evidence, viewed in a light most favorable to the prosecution, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 17.

**{¶ 24}**  This court concludes that there was sufficient evidence admitted during the state's case to allow count two to be decided by the jury.  Ironically, Warman himself introduced key evidence that supported the trial court's decision to overrule his motion.  During Colliers' testimony, defense counsel played the KG5 interview video.  During the interview, KG5 tells Colliers that she "tasted" Warman's wiener "a lot of times."

**{¶ 25}**  Viewed in a light most favorable to the prosecution, this evidence was sufficient to permit rational jurors to conclude beyond a reasonable doubt that Warman was guilty of raping KG5.  That KG5 testified otherwise at trial clearly affects the weight to be afforded to KG5's statement in the interview.  However, a court does not weigh the evidence when assessing the sufficiency of the evidence.  Accordingly, this argument is meritless.

<u>Compromised Verdicts</u>

**{¶ 26}**  Warman contends that allowing the jury to decide count two prejudiced him because it subjected him to the possibility of a compromised jury verdict.  Warman argues that the jury found him guilty of the rape of KG6 (a charge he argues was supported by little evidence) as a compromise for finding him not guilty of the rape of KG5 (a charge he asserts was supported by no evidence).

**{¶ 27}**  Warman cites several Ohio Supreme Court decisions that discuss compromised verdicts.  These cases involved courts instructing jurors on lesser-included offenses where the facts admitted at trial could never establish the elements of the lesser-included offense.  One concern set forth in those cases is that juries could improperly decide to lessen punishment even in a case where they would find the defendant guilty of the

greater offense. Another concern is that juries could decide to convict a defendant of a lesser offense even though the defendant was not guilty of that offense, so as to leave the courtroom with a cleaner conscience. *See, e.g., State v. Nolton*, 19 Ohio St.2d 133 (1969).

{¶ 28} The rationale in *Nolton* and the other compromised verdict cases is not applicable in this case. There was evidence admitted at trial to support both counts. Accordingly, it was proper to instruct the jury on both counts.

{¶ 29} Moreover, there is no indication that the jury engaged in any compromise. The evidence against Warman for the rape of KG6 was strong and the jury convicted him. The evidence against Warman for the rape of KG5 was weak, and the jury found him not guilty. Accordingly, we find this argument meritless.

### Venue

{¶ 30} Warman argues that the court erred in overruling his Crim.R. 29 motion regarding the state's failure to offer sufficient evidence establishing that the rape occurred in Butler County. Warman contends that neither KG6 or KG5 could testify where the offense occurred, variously describing the location as a "gas store," a "drive-thru" and a "parking store." The state argues that the evidence showed that Warman's trip with the children necessarily began and ended in Butler County, which was sufficient to permit jurors to determine venue.

{¶ 31} Venue – which must be proven beyond a reasonable doubt – may be established circumstantially. *State v. Birt*, 12th Dist. Butler No. CA2012-02-031, 2013-Ohio-1379, ¶ 27. This court concludes that there was sufficient evidence to allow rational jurors to determine beyond a reasonable doubt that the rape of KG6 occurred in Butler County. It was undisputed that Warman picked up KG6 at Father's home in Trenton and that Trenton was located in Butler County. KG6 testified that Warman drove her and the other children to a "gas store" where she was raped. After that, they drove to Warman's parents' house, which

the evidence established was in Middletown, Ohio. The state also submitted evidence indicating that one would necessarily stay in Butler County when travelling from Trenton to Middletown. Therefore, the court did not err in denying Warman's Crim. R. 29 motion for acquittal for failure to offer sufficient evidence of venue. The first assignment of error is overruled.

{¶ 32} Assignment of Error No. 2:

{¶ 33} THE TRIAL COURT VIOLATED MR. WARMAN'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS AND FAIR TRIAL WHEN IT FAILED TO INSTRUCT THE JURY WITH A LESSER INCLUDED INSTRUCTION.

{¶ 34} Warman argues that the court should have instructed the jury on gross sexual imposition on count one, as a lesser-included offense of rape. Warman contends that KG6's testimony concerning her physical contact with his penis was inconsistent, that during the Mayerson Center interview she variously stated that she tasted food off his penis, or licked his penis, or touched his penis. Warman argues that this evidence, viewed in a light most favorable to him, warranted a jury instruction on gross sexual imposition, which requires proof of "sexual contact" rather than "sexual conduct."

{¶ 35} Jury instructions are matters left to the sound discretion of the trial court. *State v. Tucker*, 12th Dist. Butler No. CA2010-10-263, 2012-Ohio-139, ¶ 23. Therefore, this court reviews the trial court's decision refusing to provide the jury with a requested jury instruction for an abuse of discretion. An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable. *Id.*

{¶ 36} Rape of a person under 13 is prohibited by R.C. 2907.02(A)(1)(b). The statute requires the perpetrator to engage in "sexual conduct" with the victim. Fellatio is a form of "sexual conduct." R.C. 2907.01(A). The Revised Code does not define "fellatio," however, this court has previously defined it as "a sexual act in which the mouth or lips come into

contact with the penis." *State v. Vansickle*, 12th Dist. Fayette No. CA2013-03-005, 2014-Ohio-1324, ¶ 88. The Ohio Jury Instructions define fellatio as "a sexual act committed with the penis and the mouth." Ohio Jury Instructions, CR Section 507.02(A)(1), comment 5.

{¶ 37} Gross sexual imposition only requires proof of "sexual contact" with the victim, which is defined as: "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 38} The evidence submitted at trial is the "crucial" component in determining whether to instruct jurors on a lesser-included offense. *State v. Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948, ¶ 21. A charge on a lesser-included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the charged offense and a conviction on the lesser-included offense. In reviewing for the appropriateness of a lesser-included offense instruction, we must view the evidence in a light most favorable to the defendant. *Id.*

{¶ 39} At trial, KG6 testified that Warman put his penis in her mouth and told her to "twirl all around it" with her tongue, which she did. In addition, KG5 testified that she watched Warman put a shirt over KG6's face and put his wiener in her mouth. This evidence establishes fellatio and supports Warman's conviction for rape.

{¶ 40} We do not view KG6's testimony at the Mayerson Center to have required the court to instruct the jury on gross sexual imposition. KG6 told Colliers she played the ring pop game and "it was a blue ring pop but it was his wiener." She also said she had to taste food off his wiener but could not recall what food it was. KG6's statements during the interview indicate to us that Warman used the ring pop game as the means to coerce a six year old into fellating him. Given KG6's and KG5's trial testimony, there is nothing in this record that would reasonably suggest an acquittal on the rape charge but a conviction on

gross sexual imposition. In this case, the evidence was such that the jurors would either believe the girls' testimony and find Warman guilty of rape, or not believe their testimony and find Warman not guilty. Accordingly, the second assignment of error is overruled.

{¶ 41} Assignment of Error No. 3:

{¶ 42} THE TRIAL COURT VIOLATED MR. WARMAN'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS AND FAIR TRIAL WHEN IT ADMITTED INADMISSIBLE HEARSAY TESTIMONY.

{¶ 43} Warman argues that the trial court erred when it allowed the state to play Colliers' Mayerson Center interview of KG6. The court admitted the videotape pursuant to Evid.R. 803(4), the hearsay exceptions for statements made for the purpose of medical diagnosis or treatment. Warman argued that the interview was primarily a tool for the police investigation and was not for medical purposes.

{¶ 44} At a pretrial motions hearing on the issue, Warman presented the testimony of a psychologist with experience in child sexual abuse issues. The psychologist testified that Mayerson Center interviews were designed for fact gathering in order to verify the credibility of allegations of sexual abuse. The psychologist further opined that Mayerson Center interviews were not like normal medical interviews because police were involved in the process.

{¶ 45} The state called Colliers as a witness. She testified that she conducted "forensic" interviews at the Mayerson Center, and was trained to use non-leading methods of interrogation. On cross-examination, Colliers testified that she does not diagnose illnesses. KG6 and KG5 received no medical treatment after the interviews.

{¶ 46} The admission or exclusion of evidence by the trial court is reviewed under an abuse of discretion standard. *State v. Robb*, 88 Ohio St.3d 59, 68 (2000). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or

hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is generally not admissible unless an exception applies. Evid.R. 802. Evid.R. 803(4) provides an exception to the hearsay rule as follows: "statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

{¶ 47} Hearsay statements made to a social worker may be admissible if they are made for purposes of medical diagnosis or treatment. *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267. The Ohio Supreme Court considered the admissibility of statements given during interviews at child advocacy centers in *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742. *Arnold* noted that these types of interviews seek to elicit two types of statements: statements for the purposes of medical diagnosis and treatment and forensic statements. *Id.* at ¶ 33.

{¶ 48} *Arnold* focused on the admissibility of these statements under the Confrontation Clause and not under Evid.R. 803(4). However, *Arnold* is instructive in identifying whether statements made to a social worker are primarily medical or forensic. Child-victim's statements that were necessary for medical diagnosis included the child's statements regarding the identity of the perpetrator, the type of abuse alleged, the time frame of the alleged abuse, and the identification of the areas where the child had been touched. *Id.* at ¶ 32, 38. On the other hand, statements such as the child's assertion that the offender shut and locked the door before raping her, the child's description of where others were in the house at the time of the rape, the child's statement that the offender removed her underwear, and the child's description of the offender's boxer shorts, were statements relating primarily to the investigation. *Id.* at ¶ 34, 36.

{¶ 49} In the present case, Colliers testified that she conducted *forensic* interviews of

- 11 -

KG6 and KG5, which were video-recorded. A detective watched the interviews from another room, however, neither KG5 or KG6 were aware of the police presence. Colliers conducted the interview on her own and was not talking to the detective during the interview except for one instance where she left KG6's interview to momentarily speak with the detective before resuming. After the interviews were over, Colliers discussed with the family the availability of further medical or mental health evaluation.

{¶ 50} With respect to KG6's interview, the video was over an hour long and was played in its entirety for the jury. The video begins with Colliers asking general questions of KG6 regarding safety. Colliers later asks KG6 questions concerning her knowledge about male and female anatomy, and asked her to identify body parts, including genitalia, on anatomically correct depictions of a nude girl and boy. Eventually, Colliers asks KG6 about the ring pop game. KG6 tells Colliers she played the ring pop game "one time" at a "drive-thru." She identifies where she was located in the car when she played the game and where her siblings were located. She describes how Warman tried to play the ring pop game with her sister. She tells Colliers that Warman told her not to tell her mommy about the ring pop game. She describes seeing Warman's penis. She also states that she had to put a shirt around her eyes and that Warman told her to "duck." Finally, she states that Warman told her to taste some food on his penis but she forgot what kind of food it was.

{¶ 51} Under *Arnold*, KG6's statements concerning the specifics of the sexual act she performed, i.e., how many times she did it, her physical interaction with his penis, and "ducking," were primarily for the purpose of medical treatment. However, the remaining information in the interview, including where the car was located, where she and her siblings were situated in the car, and that she had a shirt around her eyes were statements drawn from her primarily for a forensic or investigative purpose. Because these statements were not primarily for medical diagnosis or treatment they should not have been admitted under

the Evid.R. 803(4) hearsay exception.

{¶ 52} Accordingly, some of the statements KG6 made in the interview did not fall under the hearsay exception for medical diagnosis or treatment, and therefore the admission of those statements was error to the extent that they were offered to prove the truth of the matter they asserted. However, such error was harmless as the state presented ample evidence other than the video-recorded interview to sustain Warman's conviction for the rape of KG6. Crim.R. 52(A); see *State v. Richardson*, 12th Dist. Clermont Nos. CA2014-03-023, CA2014-06-044, and CA2014-06-045, 2015-Ohio-824, ¶ 38. As will be discussed in greater detail in the next assignment of error, KG6 testified concerning the ring pop game and graphically described how Warman raped her. Her testimony was far more descriptive than what she discussed with Colliers during the interview. Accordingly, we are convinced that the jury necessarily relied on KG6's testimony rather than her recorded statements in concluding that Warman was guilty of raping her. Accordingly, the third assignment of error is overruled.

{¶ 53} Assignment of Error No. 4:

{¶ 54} MR. WARMAN'S CONVICTION AS TO COUNT ONE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 55} Warman argues that his conviction for raping KG6 was against the manifest weight of the evidence. He contends that KG6 and KG5 lacked credibility and that their trial testimony was inconsistent with what they said in the Mayerson Center interviews. Warman argues that KG6 appeared normal to Warman's parents immediately after the alleged rape occurred and that KG6 did not disclose the abuse until much later. Warman also contends that the evidence indicates that KG6's and KG5's testimony may have been tainted or influenced by Father and stepmother. Finally, Warman points out that his witnesses testified that he was a wonderful father and had a great relationship with both KG6 and KG5.

{¶ 56} In determining whether a judgment is against the manifest weight of the

evidence, an appellate court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Cooper*, 12th Dist. Butler No. CA2010-05-113, 2011-Ohio-1630, ¶ 7. The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 57} After a thorough review of the record, we find that Warman's conviction for raping KG6 was not against the manifest weight of the evidence. At trial, KG6 convincingly described being raped in terms a six year old would use to convey sexual abuse. She testified that Warman parked in the back of a "gas store." He looked around before he began the abuse. Warman had her move into the front seat, tied a shirt around her eyes, told her to "duck," then put his penis in her mouth. She explained that "duck" meant to bend over. He instructed her to "twirl all around" his penis with her tongue, which she did. KG6 also described how Warman stopped raping her and attempted to rape KG5, who refused to "duck." So he raped KG6 again.

{¶ 58} KG5 corroborated KG6's testimony. KG5 also used child-like terms to describe the abuse. KG5 testified that she watched the ring pop game but did not play because she did not want to. She saw Warman's "wiener" go into KG6's mouth and that he "bumped" KG6's head "up and down, up and down."

{¶ 59} The jury found KG6's and KG5's testimony believable and we defer to the factfinder with respect to credibility determinations. Warman argues that KG6's Mayerson Center statement about "tasting" food off of his penis was inconsistent with her description of fellatio at trial, but we do not find the interview to be inconsistent. KG6's statements about

food could explain Warman's method of coercing KG6 to fellate him. This is corroborated by KG6's interview statement that "[Warman] said it was a blue ring pop but it was his wiener." Moreover, to the extent that there were any inconsistencies in the Mayerson Center interviews and the victims' trial testimony, the jury was able to view both videos in their entirety and could consider the effect of any perceived inconsistencies during their deliberations.

{¶ 60} Warman's argument that KG6's and KG5's testimony could have been "tainted" or "influenced" by Father and stepmother was presented in Warman's defense but there was no credible evidence to support this theory. The length of time it took KG6 to report the abuse was not unusual especially given Warman's admonition not to tell anyone. Warman's reputation as a good father and his pre-existing relationship with the children was also presented to the jury but has little bearing on whether the jury believed KG6's testimony. The jury could accept both that he had a reputation as a good father and had a good relationship with KG6 but nevertheless raped her. In sum, we do not find that the jury lost its way or created such a manifest miscarriage of justice that Warman's conviction must be reversed. Consequently, the fourth assignment of error is overruled.

{¶ 61} Judgment affirmed.

M. POWELL, P.J., concurs.

PIPER, J., concurs separately.

**PIPER, J., concurring separately.**

{¶ 62} I concur with the majority in overruling Warman's third assignment of error but my analysis concludes it was not an error for the trial court to admit into evidence KG6's

entire out-of-court statement.[5]

{¶ 63} As the committee note attendant to Evid.R. 803(4) suggests, the medical diagnosis or treatment hearsay exception should not be a conduit through which matters of *no* medical significance would be admitted. Yet, this court has noted the important "dual role" of nurses and social workers who interview children alleging sexual abuse. *State v. Rose*, 12th Dist. Butler No. CA2011-11-214, 2012-Ohio-5607, ¶ 42. The committee note attendant to Evid.R. 803(4) also suggests that the information elicited for purposes of medical treatment is not inadmissible at a later trial merely because that information subsequently serves the purpose of a criminal prosecution. When offered, or elicited, for the primary purpose of medical diagnosis or treatment, the artificial distinctions between the dual purposes served are to be avoided.

{¶ 64} The majority opinion suggests it was an error for the trial court to admit certain sentences within KG6's statement as they identify who else may have been present, the physical proximity of each person to one another, and where the abuse took place. To parse out these sentences as being solely testimonial, or forensic, and not reasonably pertinent for medical purposes seems misguided.

{¶ 65} "Easy" conversation with a little person often makes that child feel more comfortable and thus more likely to discuss difficult topics. Factual conversation leading up to the sensitive subjects involving sexual contact or conduct helps in obtaining important information. Similarly, showing interest in a child's conversation also makes it easier for

---

5. Warman's third assignment of error does not argue a violation of the Confrontation Clause but merely that Evid.R. 803(4) required the trial court to exclude KG6's out-of-court video statement. Warman does not argue a violation of the Confrontation Clause because "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of * * * prior testimonial statements." *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), fn. 9. It is the "opportunity" for cross-examination that the Confrontation Clause guarantees. *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, ¶ 68. KG6 did, in fact, testify and was cross-examined and Warman's trial counsel had possession of her out-of-court statement prior to trial thereby possessing the opportunity for cross-examination. See *State v. Louis*, 4th Dist. Scioto No. 15CA3693, 2016-Ohio-7596, ¶ 51.

some young people to talk about difficult subjects. Some in the legal community seem to propose the trained facilitators of treatment for those sexually abused avoid peripheral facts. This is unworkable.

**{¶ 66}** Conversation is often necessary in order to approach difficult topics and cannot be discussed bluntly or in isolation.[6] Children are oriented to time, space, and distance very differently than adults. Discussing occurrences sequentially often aids children in their reporting accuracy. Ensuring accuracy to the greatest extent possible is reasonably pertinent to medical diagnosis and treatment. Since Colliers was a properly trained specialist working on behalf of the medical team at the Mayerson Center, and apparently followed appropriate protocol, I cannot find the information the majority determines was an error for the trial court to admit into evidence was an abuse of discretion on the trial court's part.

**{¶ 67}** A trial court has broad discretion in admitting or excluding evidence, and a trial court's ruling in admitting evidence will be upheld absent an abuse of discretion. *Rose*, 2012-Ohio-5607, ¶ 41. "The salient inquiry when determining whether a hearsay statement is admissible under Evid.R. 803(4) is whether the statement was made for purposes of diagnosis or treatment rather than for some other purpose." *Id.* at ¶ 42, citing *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, ¶ 47. Admission of evidence pursuant to Evid.R. 803(4) pivots on when, how, and under what circumstances the out-of-court statements are generated in order to determine the purpose for which it was generated; it does not pivot on its subsequent use.

**{¶ 68}** Several factors are considered when determining the purpose of a child's

---

6. Interviewing children is a unique challenge particularly with children victimized by abuse of a sexual nature. This challenge is often assigned to social workers and nurses with specialized training. The setting, technique, nature of harm, and means to elicit and evaluate information is both an art and a science, and the subject of numerous treatises. *See, e.g.*, Clow, *Throwing a Toy Wrench in the "Greatest Legal Engine": Child Witnesses and the Confrontation Clause*, 92 Wash. U. L. Rev. 793 (2015); Russell, *Documentation and Assessment of Children's Forensic Interview Statements*, 16 Widener L. Rev. 305 (2010); *see also Ohio v. Clark*, 576 U.S. ___, 135 S.Ct. 2173 (2015).

statements made to either a nurse or social worker regarding sexual abuse. The factors are fact-dependent and may include the following:

1) Whether the child was questioned in a leading or suggestive manner;

2) Whether there is a motive to fabricate, such as a pending legal proceeding or bitter custody battle;

3) Whether the child understood the need to tell the physician the truth;

4) Whether the age of the particular child making the statements suggest the absence or presence of an ability to fabricate;

5) Whether the child was consistent in her declarations; and

6) The manner in which a physician or medical provided elicited or pursued a disclosure of abuse by a child victim as shown by evidence of the proper protocol for interviewing children alleging sexual abuse.

*Muttart* at ¶ 49.

{¶ 70} The inception of sexual abuse activities includes the general character of its cause and its source as well as any associated symptoms, pain, or sensations. Evid.R. 803(4). Obviously, explanations of sexual abuse will involve facts and details, some at the end of the day more relevant than others to later diagnosis or treatment. Simply because facts gathered for medical reasons may eventually be less significant, does not mean that they were not originally offered, or generated, for pertinent medical purposes rather than for the purposes of preserving testimony for criminal prosecution.

{¶ 71} Narrative accounts can be reasonably pertinent in establishing a potential diagnosis or treatment. Even though the victim's narrative account offered to medical personnel can subsequently be used by law enforcement in a criminal prosecution does not prevent the statement from being admitted into evidence pursuant to Evid.R. 803(4). *State v. Thomas*, 8th Dist. Cuyahoga No. 101202, 2015-Ohio-415, ¶ 24.

{¶ 72} A description of an abusive encounter has consistently been determined to be within the scope of statements offered for medical treatment or diagnosis. *State v. Diaz*, 8th Dist. Cuyahoga No. 103878, 2016-Ohio-5523, ¶ 33-34. A narrative account containing peripheral details as the victim recounts abusive activities can be made for the primary purpose of medical diagnosis or treatment. *State v. Williams*, 1st Dist. Hamilton No. C-140199, 2015-Ohio-3968, ¶ 31-34.

{¶ 73} "[F]acts associated with the rape are relevant for medical diagnosis and treatment * * *. A patient's statements concerning how the alleged rape occurred can be relevant to show the 'general cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment * * *.'" *Diaz* at ¶ 34, citing *State v. Menton*, 7th Dist. Mahoning No. 07 MA 70, 2009-Ohio-4640, ¶ 51 (holding that a description of how a sexual assault took place was part of the victim's medical history).

{¶ 74} For example, the majority takes exception to medical personnel ascertaining that KG6's sexual abuse occurred while she was blindfolded. Certainly, such fact could aid in explaining to medical providers KG6's injuries, sensations, pain or the lack thereof, or her limited ability to report the same in determining potential medical needs. If the victim had been blind it would be relevant. Then too, it should be relevant if the victim was artificially blinded. Assessing a child's reporting abilities and determining the facts surrounding allegations, and how such allegations occurred, are prudent factual inquiries and are reasonably pertinent to potential medical purposes. While medical treatment occurs in a sterile environment, it is not one without the need for context.

{¶ 75} Even Warman's expert testified at a motion in limine that sexual abuse interviews taking place at the Mayerson Center were unique. He acknowledged the need for fact-gathering in order to substantiate allegations and ascertain credibility for purposes of diagnosis and treatment. Even if Warman's assignment of error had focused on the

Confrontation Clause instead of just Evid.R. 803(4), we should take note that the United States Supreme Court in assessing an individual's constitutional right to confront one's accuser has "never suggested * * * that the Confrontation Clause bars the introduction of all out-of-court statements that support the prosecution's case. Instead, we ask whether a statement was given with the 'primary purpose of creating an out-of-court substitute for trial testimony.'" *Clark*, 135 S.Ct. 2173, 2183, citing *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S.Ct. 1143 (2011).

{¶ 76} In reviewing the factors found in *Muttart,* and examining our record, I cannot find the context in which the sexual abuse occurred or how it occurred, was unnecessary, or not pertinent for medical diagnosis or treatment within the purview of Evid.R. 803(4). Similarly, if an analysis as found in *Arnold* involving the Confrontation Clause becomes relevant I would find KG6's statement to Colliers at the Mayerson Center to be offered and elicited primarily for the purposes of medical treatment and not as a substitute for trial testimony. See *Clark* at *id.*[7]

{¶ 77} Even if KG6's statement should be scrutinized for specific content, or portions, our appellate review should note that Warman's counsel neither at trial or upon appeal argued any specific content, portions, or pieces of KG6's statement were inadmissible. At trial, defense counsel made no objections specific to the sentences the majority now extracts as objectionable. Similarly, Warman's appellate counsel made no argument directed to the parsed sentences the majority singles out as inadmissible. Therefore, the state has never had an opportunity to suggest why such statements were reasonably pertinent to medical diagnosis or treatment. Therefore, I find it impossible to determine the trial court committed an error in its evidentiary ruling. Since Warman's trial counsel gave a general objection to

---

7. *Arnold* gives guidance to the majority's analysis. However, the circumstances in *Arnold* involved a child victim who did not give testimony at trial.

KG6's out-of-court statement coming into evidence but did not object to any particular content or sentences, I would find any claimed error as to such content or sentences waived.

{¶ 78} As a concluding note, I find it somewhat disingenuous that Warman's counsel suggests that KG6's out-of-court statement should not be admitted pursuant to Evid.R. 803(4) where Warman's counsel at trial admitted KG5's out-of-court statement into evidence pursuant to Evid.R. 803(4). Warman's trial counsel did not ask for any type of redaction at trial and Warman's appellate counsel did not suggest the trial court erred in failing to redact KG6's statement. Therefore, the trial court did not commit an error in failing to redact portions of KG6's statement as suggested by the majority opinion.

{¶ 79} While I concur with the majority opinion in all other matters, I write separately as to the third assignment of error because the trial court admitted KG6's entire statement because it was reasonably pertinent to the medical diagnosis or treatment of KG6 and admitted properly pursuant to Evid.R. 803(4).