[Cite as *State v. Burson*, 2024-Ohio-1834.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2022-12-012 |
| | : | O P I N I O N |
| - vs - | | 5/13/2024 |
| | : | |
| ROY BURSON, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
Case No. CRI2020-2075

Zachary A. Corbin, Brown County Prosecuting Attorney, and Mary McMullen, Assistant Prosecuting Attorney, for appellee.

Steven H. Eckstein, for appellant.

**BYRNE, J.**

{¶ 1} Roy Burson appeals from multiple convictions for rape in the Brown County Court of Common Pleas. For the reasons described below, we affirm his convictions, as modified.

**I. Factual and Procedural Background**

{¶ 2} Brown County Children Services placed two sisters, "Anne" and "Bailey," with their grandmother, Linda Burson, in July 2013.[1] Their two other siblings (a brother and another sister), also were placed with Linda. At the time of placement, Anne was eight years old and Bailey was five years old.

{¶ 3} Six years after their placement, in July 2019, deputies responded to a 9-1-1 call reporting an altercation at Linda Burson's residence, located at 7941 Day Hill Arnheim Road ("the Burson property"). The altercation was between the sisters' grandfather, James Burson, and the sisters' uncle, defendant Roy Burson. During the police encounter, Roy accused James of sexually abusing Anne and Bailey.

{¶ 4} The sisters were removed from the Burson property and taken to the Mayerson Center for Safe and Healthy Children ("Mayerson Center") where Anne disclosed sexual abuse (specifically, sexual touching) by James perpetrated on both herself and Bailey. Bailey did not disclose abuse by James or any other person at that time.

{¶ 5} Seven months later, in a second Mayerson Center interview, both Anne and Bailey disclosed sexual abuse by Roy. Anne alleged that Roy was sexually touching her. Anne also stated that she had seen Roy alone with Bailey, and Roy was on top of Bailey, sometimes with his pants off. Separately, Bailey disclosed acts of vaginal and oral penetration by Roy.

{¶ 6} In May 2020, a Brown County grand jury indicted Roy on 21 counts. The first 16 counts all involved Bailey. The remaining counts involved Anne.

{¶ 7} Counts One through Nine—concerning Bailey—are the only counts challenged in this appeal. All nine counts were for rape, in violation of R.C. 2907.02(A)(1)(b). Counts One, Two, and Three alleged acts of rape that occurred between

---

1. For purposes of privacy and readability, we refer to the minor victims and other children at issue in this case using fictious names. *See In re A.P.*, 12th Dist. Warren No. CA2022-01-002, 2022-Ohio-3181, ¶ 2, fn.1.

January 1, 2017, to February 22, 2018, when Bailey was less than ten years of age. Counts Four through Nine alleged acts of rape that occurred between February 23, 2018, and July 9, 2019, when Bailey was over ten years of age but under 13 years of age.

{¶ 8} Prior to trial, Roy moved to preclude Bailey from testifying at trial based on her alleged incompetency to testify under Evid.R. 601(B). Roy alleged that Bailey was developmentally delayed and did not have the capacity to reason between truth and a lie. Roy requested that the court conduct an examination into Bailey's competency.

{¶ 9} The court held a competency hearing to address Bailey's capacity to testify at trial. At the hearing, the record reflects that Bailey had difficulty answering defense counsel's questions. Afterwards, the court issued an entry granting Roy's motion to disqualify Bailey as a trial witness for the state.

{¶ 10} In its decision, the court noted that Bailey was unable to answer several questions. The court further acknowledged a report from a school psychologist, which indicated that Bailey had an extremely low functioning range and an IQ of 54. Accordingly, the court found Bailey incompetent to testify at trial.

{¶ 11} Roy also filed a liminal motion asking the court to exclude all statements made by Anne and Bailey, as well as their brother, in their Mayerson Center interviews, based on the argument that those interviews were testimonial in nature. The court granted in part and denied in part Roy's request. The court found that Anne's and Bailey's statements in their Mayerson Center interviews were primarily for healthcare purposes and therefore admissible. However, the court excluded their brother's statements, because he was not identified as a victim in the case and was not in need of physical or emotional healthcare while being interviewed at the Mayerson Center.

{¶ 12} Prior to the commencement of trial, Roy reiterated his objection to the Mayerson Center interview evidence. He indicated that he filed the motion in limine based

on a violation of his confrontation rights, but that he understood that the court found the evidence admissible under Evid.R. 803(4).

{¶ 13} Roy's counsel then stated that he wanted to place on record that he believed that "this" (the admission of hearsay under Evid.R. 803[4]) was "sort of unsettled, in the federal arena." Roy's counsel also discussed the court's finding that Bailey was incompetent to testify and argued that this incompetence affected the reliability of her statements made in the Mayerson Center interview. Roy's counsel stated that he was making a record for his client for possible federal review. The court overruled the objection and noted that it would stand by its earlier ruling.

## A. The Trial

{¶ 14} The matter proceeded to a jury trial in November and December 2022. All counts of the indictment were tried, except for two, which were dismissed before trial. The following is a summary of the trial testimony relevant to this appeal.

### 1. Anne's Testimony

{¶ 15} Anne testified that she was 17 years old and was born in June 2005. She had three younger siblings, a brother and two sisters. Her sister Bailey was then 13 or 14 years old.[2]

{¶ 16} Anne testified that in 2016 or 2017 she began living at the Burson property with her grandmother, Linda Burson.[3] At that time, Linda Burson was the only adult living there. Anne's siblings were living there with her as well.

---

2. The trial record reflects that Bailey would have been 14 years old at the time of trial.

3. There was some apparent confusion in Anne's testimony regarding the dates. The record reflects that Anne and Bailey were placed at the Burson property in 2013. However, as indicated here, Anne testified that she began living at the Burson property in 2016 or 2017. But Anne also stated that she began living there when she was around 7 years old, which would be consistent with her being placed there around 2013 and not be consistent with 2016 or 2017. The state acknowledged this inconsistency in Anne's testimony in closing argument and attributed it to her confusion.

{¶ 17} According to Anne, during the first year she lived at the Burson property, child protective services caseworkers visited and would check on Anne and her siblings. Things went well that first year. Anne liked living at the Burson property and recalled being well fed.

{¶ 18} Anne testified that James Burson, Linda's on-again, off-again husband, did not live at the Burson property. But James would visit the Burson property every day, multiple times a day. Roy Burson, Anne and Bailey's uncle, started living at the Burson property on an off-and-on basis.

{¶ 19} Anne testified that after the caseworkers stopped checking in, things at the Burson property got progressively worse for Anne and her siblings. Anne explained that if the children made the adults at the home mad, the adults would force the children to sleep outside. They also withheld food. There was physical abuse. Anne also recalled a lot of physical fighting occurring between James and Roy.

{¶ 20} Anne testified that sexual abuse began occurring at the Burson property in 2017. It continued until she left the Burson property in 2019, at the age of 14. The sexual abuse was perpetrated on her by both James and Roy. The sexual abuse perpetrated on her by Roy involved repetitive sexual contact, that is, sexual touching. She was also aware of sexual abuse committed by James and Roy against Bailey.

{¶ 21} With regard to her own abuse, Anne testified that she recalled going to school with hickeys on her neck, which had been given to her by Roy. One time, a teacher saw the hickeys and she got called to the office. She told "them"—presumably the office staff—that Roy had caused the hickeys and the school called Linda. After she went home, Linda told her she had to lie. A caseworker came out and Anne told the caseworker the story that Linda had told her to say, which was that a kitten was suckling on her neck long enough to leave a hickey.

{¶ 22} Anne testified when she was around 11 or 12 years old, Linda observed a hickey on her neck. Anne told Linda that Roy had his mouth on her neck. Linda went "ballistic" and physically attacked her throughout the house, breaking a paddle that she was using to beat Anne. Linda continued the attack with a toilet plunger, striking Anne on her back and the rest of her body.

{¶ 23} Anne testified that Roy had told her that no one would believe her if she accused him. After the beating from Linda, she did not want to tell anyone. The beating left her with a lot of physical pain and she could not go to school for the next week because she had bruises all over her body.

{¶ 24} Anne witnessed what she believed was sexual abuse against Bailey perpetrated by Roy. One time she went out to the porch, where Roy had a mattress where he slept. She saw Roy alone with Bailey and it looked like he was "toppling" her. She believed that Bailey was under the age of 10 at the time.

{¶ 25} There were multiple outbuildings on the Burson property. The state reviewed photographs of the Burson property and its various outbuildings with Anne. Anne stated that on one occasion, she went into one of these outbuildings, which she called "the laundry barn," where Linda kept her laundry. Anne found Bailey alone with Roy. Roy was on top of Bailey. He did not have his pants on, "exactly." She stated that she had seen this occurrence in "multiple different spots" on the Burson property.

{¶ 26} On another occasion, Anne found Bailey alone with Roy in what she called "Roy's barn." Roy was on top of Bailey.

{¶ 27} The abuse stopped on a particular day in July 2019. That day, Roy and James were fighting with each other. Each had accused the other of sexually abusing Anne and Bailey, even though, as Anne testified, both were sexually abusing the children. Police were called and the children were removed from the Burson property.

**2. School Employees' Testimony**

{¶ 28} The state elicited testimony from two school employees: a cafeteria worker and Anne's sixth grade teacher. The cafeteria worker recalled seeing Anne walk through the lunch line one day with what appeared to be hickeys from "ear to ear." She had never seen this before on a sixth grader and it concerned her so greatly that she spoke to Anne's teacher about it.

{¶ 29} Anne's sixth grade teacher testified that she recalled the cafeteria worker sharing her concerns and promised that she would investigate. However, Anne was absent from school on the first day she had an opportunity to ask her about the concerns. Anne was absent at least one more day afterwards. The teacher testified that when Anne returned to school, she asked to see her neck, but there were no marks on it.

{¶ 30} During the teacher's testimony, the state submitted an exhibit depicting Anne's absences from school in the 2017-2018 school year, when she would have been in sixth grade. Anne had two consecutive unexcused absences in November of that year.

**3. Emily Harman's Testimony and State's Exhibit 3**

{¶ 31} Harman testified that she was a licensed social worker who worked at the Mayerson Center as both a social worker and forensic interviewer.

{¶ 32} Harman testified that, as part of her work at the Mayerson Center, she interviewed Bailey in February 2020. During the interview, Bailey disclosed multiple incidents of sexual crimes perpetrated by Roy Burson. In addition to incidents of sexual contact, Bailey described multiple incidents of sexual conduct. Specifically, Bailey described acts of penile-vaginal and penile-oral penetration (vaginal sex and fellatio). She described both acts as occurring at multiple locations on the Burson property. Specifically, Bailey described acts occurring on the Burson property's front porch, in the Burson property's barns, and at a creek on the Burson property.

{¶ 33} Harman discussed State's Exhibit 3, which was a social work report that summarized her interview with Bailey. State's Exhibit 3 referenced Bailey's disclosure of multiple incidents of sexual conduct occurring at the various locations on the Burson property, as testified to by Harman.

{¶ 34} Harman further discussed the Mayerson Center generally, and how the center's staff operate as a multi-disciplinary team to evaluate, diagnose, and treat the effects of child abuse and neglect. Harman testified about her collaborative efforts with other members of the team following Bailey's disclosure, and the medical and therapeutic recommendations that followed the disclosure.

### 4. Nora's Testimony

{¶ 35} "Nora" testified that she was born in 2007 and was currently 15. Nora is Anne and Bailey's cousin.

{¶ 36} Nora first testified to her lengthy history of being moved around as a child. Her first recollection of home was the Burson property, where she lived with her mother, her mother's boyfriend, and her grandmother (Linda Burson). Nora was under five years old at the time, not yet attending school. She and her family then moved to Pennsylvania for "a couple years." Then her mother got into criminal trouble and Nora returned to living at the Burson property for approximately two months, when she estimated that she was six or seven years old.

{¶ 37} After her two-month stay at the Burson property, Nora spent another couple months living with her aunt. Then she moved back in with her mother. They lived in Ripley, Ohio for what she estimated was two years. During this time living with her mother in Ripley, they visited the Burson property every day.

{¶ 38} Nora recalled that during this time living with her mother, Anne and Bailey were living at the Burson property. Her grandfather and her uncles, including Roy, would

also "come in and out." Roy was there "a lot."

{¶ 39} Nora testified that one day she saw Roy on top of Bailey in the "big barn." On another occasion, she saw Roy on top of Bailey in the creek. In the creek incident, she observed Roy get up quickly and pull his pants up. He had been on his knees and was leaning over Bailey. Bailey was on her back. Nora was not sure how old Bailey would have been during these incidents.

**B. Verdict, Sentence, and Appeal**

{¶ 40} The jury found Roy guilty as charged on all non-dismissed counts in the indictment, including the nine counts at issue in this appeal. The trial court sentenced Roy to an aggregate prison term constituting a sentence of life without parole. Roy appealed, raising four assignments of error.

**II. Law and Analysis**

**A. Admissibility of Harman's Testimony and Reports and Bailey's Competency**

{¶ 41} Roy's first assignment of error states:

> THE TRIAL COURT ERRED IN ALLOWING THE REPORT OF
> THE [MAYERSON CENTER] INTERVIEW OF [BAILEY] AND
> THE TESTIMONY OF THE INTERVIEWER INTO EVIDENCE
> OVER THE OBJECTION OF THE DEFENDANT-APPELLANT.

{¶ 42} Roy contends that the trial court abused its discretion in not excluding Harman's testimony as to Bailey's statements in the Mayerson Center interview as well as the various state's exhibits consisting of summaries of the Mayerson Center interview, including State's Exhibit 3. Roy argues that this evidence was hearsay and not admissible pursuant to Evid.R. 803(4) because Harman was not a medical professional. Furthermore, Roy argues that Bailey was declared incompetent, and thus her statements in the Mayerson Center interview were not credible and were made when she was incompetent to testify.

**1. Standard of Review**

{¶ 43} The admission or exclusion of evidence is a matter committed to the sound discretion of the trial court. *State v. White*, 12th Dist. Warren No. CA2018-09-107, 2019-Ohio-4312, ¶ 30. An appellate court will not reverse the trial court's decision to admit or exclude relevant evidence absent an abuse of discretion. *Id.* An abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Gearhart*, 12th Dist. Warren No. CA2017-12-168, 2018-Ohio-4180, ¶ 13.

### 2. Hearsay and Admissibility of the Mayerson Center Evidence Under Evid.R. 803(4)

{¶ 44} Evid.R. 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." The hearsay rule, set forth in Evid.R. 802, provides that hearsay is not admissible except as otherwise provided by various enumerated exceptions, including but not limited to exceptions found in Evid.R. 803.

{¶ 45} Relevant to this appeal, Evid.R. 803(4) provides an exception to the hearsay rule for statements made by a declarant for purposes of medical diagnosis or treatment:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

{¶ 46} Roy argues that Harman's testimony and the interview summary were inadmissible under Evid.R 803(4) because the "social worker [Harman] was the one who received the statements from [Bailey] concerning sexual conduct, not the doctor!"

{¶ 47} There is nothing in the text of Evid.R. 803(4) that requires statements otherwise admissible under that rule to be made to a physician or any other specified medical professional. But in *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, the Ohio

- 10 -

Supreme Court reviewed whether a child victim's statements to a social worker concerning sexual abuse were admissible under Evid.R. 803(4). There, the child was interviewed by a social worker at the Child Maltreatment Clinic at Mercy Children's Hospital in Toledo. *Id*. at ¶ 14. The child revealed sexual abuse, which the social worker then relayed to a physician specializing in the treatment of sexually abused children. *Id*. at ¶ 14, 17. The supreme court noted that in cases in which a statement is made for medical diagnosis or treatment, the presumption is that the statement is reliable. *Id*. at ¶ 47. The Ohio Supreme Court explained that the "salient inquiry" for the court ruling on the statement's admissibility is whether the statement was made for purposes of diagnosis and treatment, rather than "some other purpose." *Id*.

{¶ 48} The supreme court set forth a non-exhaustive list of considerations for courts to analyze when assessing whether statements were made for purposes of diagnosis and treatment. Those considerations included, (1) whether the child was questioned in a leading or suggestive manner; (2) whether there is a motive to fabricate, such as a pending legal proceeding such as a bitter custody battle; (3) whether the child understood the need to tell the physician the truth; (4) the age of the child making the statements, which might suggest the absence or presence of an ability to fabricate, and the consistency of her declarations and; (5) the manner in which a physician or other medical provider elicited or pursued a disclosure of abuse by a child victim, as shown by evidence of the proper protocol for interviewing children alleging sexual abuse. *Id*. at ¶ 49.

{¶ 49} After analyzing the statements made by the child victim in *Muttart* to the social worker with respect to these considerations, the supreme court held that the statements were made for purposes of medical diagnosis and treatment and were admissible pursuant to Evid.R. 803(4). *Id*. at ¶ 56.

{¶ 50} Following *Muttart*, this court has repeatedly upheld the admission of

statements made to social workers at the Mayerson Center for purposes of medical diagnosis and treatment. *E.g.*, *State v. Turner*, 12th Dist. Brown No. CA2019-05-005, 2020-Ohio-1548, ¶ 52 ("statements made to a social worker for the purposes of medical diagnosis and treatment are an exception to the hearsay rule"); *State v. Warman*, 12th Dist. Butler No. CA2016-02-029, 2017-Ohio-244, ¶ 3, 47, 51 (finding specific statements to a social worker admissible under Evid.R. 803[4]); *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 3, 44 (finding "several" statements made to a social worker admissible under Evid.R. 803[4]).

{¶ 51} Roy does not explain why the statements made by Bailey to Harman in the Mayerson Center interview were not for purposes of medical diagnosis and treatment. Instead, he simply argues that Harman was not a doctor, but a social worker, and the statements made by Bailey were only relayed to the doctor by Harman. However, as set forth above, statements made to a social worker for purposes of medical diagnosis or treatment are admissible under Evid.R. 803(4). *Muttart*, 2007-Ohio-5267 at ¶ 56; *Turner* at ¶ 52.

{¶ 52} There is nothing in our record that would suggest that Bailey's statements at the Mayerson Center were not made for purposes of medical diagnosis and treatment. Instead, the record reflects that the statements were made by Bailey for use by the Mayerson Center in assessing Bailey's potential need for medical care resulting from sexual abuse.

{¶ 53} Harman testified that she had a bachelor's degree and master's degree in social work and was a licensed social worker. She had been working for 15 years as a social worker and worked at the Mayerson Center as a social worker and forensic interviewer. Harman explained that Mayerson Center employees work as a multi-disciplinary team to evaluate, diagnose, and treat victims of child abuse and neglect. This

team consists of social workers, forensic interviewers, child abuse physicians, therapists, law enforcement, and child protective services employees.

{¶ 54} Harman testified that her written interview report, i.e., State's Exhibit 3, summarized her interview with Bailey during which Bailey disclosed multiple incidents of sexual abuse by Roy. Harman testified that after the interview, she consulted with a child abuse physician at the Mayerson Center concerning Bailey's statements. Furthermore, employees of the Mayerson Center met as a team and discussed the interview and therapy recommendations. The medical recommendations resulting from the interview were for Bailey to continue with "established therapeutic interventions."

{¶ 55} Given the record before us, we are satisfied that Bailey's statements to Harman at the Mayerson Center concerning sexual abuse perpetrated by Roy were made for purposes of diagnosing or treating the effects of child abuse. That is, the statements were made by Bailey for the use of Mayerson Center employees in diagnosing Bailey and assessing her need for medical care. That the statements were made to a social worker does not mean that the statements were not reliable or inadmissible under Evid.R. 803(4). *Muttart*, 2007-Ohio-5267 at ¶ 56; *Turner*, 2020-Ohio-1548 at ¶ 52.

{¶ 56} Roy also argues that the court, in its entry denying his liminal motion, failed to list the specific *Muttart* considerations in explaining its ruling that Bailey's statements were for "healthcare purposes." However, Roy never asked the court for specific findings of fact regarding the considerations under *Muttart*. In fact, Roy never cited *Muttart* in his motion in limine. Instead, Roy's argument presented in the motion in limine was limited to the argument that Bailey's statements at Mayerson Center were testimonial in nature and cited *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, in support. In its entry, the court stated it had considered *Siler* and found that the interview with Bailey was non-testimonial and was conducted for "healthcare purposes." Regardless, we find no error in this regard

because, as set forth above, the record supports the conclusion that the statements made by Bailey in the Mayerson Center interview were for purposes of medical diagnosis and treatment.

### 3. Competency

{¶ 57} Roy explains that the "true issue" he is raising in his first assignment of error is Bailey's competency; that is, he asks whether an "incompetent can be relied upon to tell the truth to a medical professional * * *."

{¶ 58} Evid.R. 601 addresses the competency of witnesses. The rule provides, generally, that "Every person is competent to be a witness except as otherwise provided in these rules." Evid.R. 601(A). The rule also provides that a person is

> disqualified to testify as a witness when the court determines that the person is any of the following:
>
> (1) Incapable of expressing himself or herself concerning the matter as to be understood, either directly or through interpretation by one who can understand him or her;
>
> (2) Incapable of understanding the duty of a witness to tell the truth
>
> * * *.

Evid.R. 601(B).

{¶ 59} Roy argues that at the hearing to address Bailey's competency, Bailey could only answer a few basic questions. Roy points out that the court found her incompetent to testify and noted that she had a low functioning range and low IQ. Roy argues that it was "highly unlikely" that Bailey's IQ was "different" at the time of the Mayerson Center interview, which occurred around 17 months prior to the date of the competency hearing. Roy also argues that Bailey was younger at the time of the Mayerson Center interview.

{¶ 60} We find no merit to Roy's argument here. Roy is conflating the issue of Bailey's competency to give testimony at trial with her ability to make truthful statements

about sexual abuse to a trained social worker. In its entry granting Roy's request to have Bailey declared incompetent to testify, the court noted her inability to answer several questions posed by Roy's defense counsel and her lack of responsiveness generally. The court also noted her low IQ and low functioning range. However, the court never stated any concerns about Bailey's ability to tell the truth. That is, the court's basis for declaring Bailey incompetent was her incapacity to express herself concerning the matter that she was questioned upon, pursuant to Evid.R. 601(B)(1), not her inability to distinguish truth from fiction, pursuant to Evid.R. 601(B)(2).

{¶ 61} We also note that counsel's questions at the competency hearing were not posed to Bailey in a simplistic manner. Many of the questions presented by counsel were compound questions, or generally overwrought. The record reflects that the trial court repeatedly suggested that counsel ask Bailey one question at a time, or simplify the question, which counsel was either unable to do or chose not to do.

{¶ 62} That Bailey may have had difficulty testifying in a courtroom environment does not mean that she could not articulate sexual abuse to a trained medical professional or social worker. In this regard, we note that in *Muttart*, the Ohio Supreme Court stated, "[w]e hold that regardless of whether a child less than ten years old has been determined to be competent to testify pursuant to Evid.R. 601, the child's statements may be admitted at trial as an exception to the hearsay rule pursuant to Evid.R. 803(4) if they were made for purposes of medical diagnosis or treatment." 2007-Ohio-5267 at ¶ 46. The supreme court went on to state that, "[t]he salient inquiry here is not [the child victim's] competency but whether her statements were made for purposes of diagnosis and treatment rather than for some other purpose." *Id*. at ¶ 47.

{¶ 63} Accordingly, the finding of Bailey's incompetency to testify did not mean that the court could not independently find that the statements she made to Harman in the

Mayerson Center interview were sufficiently reliable to be admitted pursuant to Evid.R. 803(4).

{¶ 64} We overrule Roy's first assignment of error.

## B. Manifest Weight of the Evidence

{¶ 65} Roy presents his second and third assignments of error together.

{¶ 66} Roy's second assignment of error states:

THE ADMISSION OF THE HEARSAY TESTIMONY OF THE INTERVIEWER OF [BAILEY] AND STATE'S EXHIBIT 3 WAS NOT HARMLESS ERROR.

{¶ 67} Roy's third assignment of error states:

THE TRIAL COURT ERRED IN ACCEPTING THE JURY'S VERDICT OF GUILTY AS TO ALL NINE COUNTS OF RAPE BECAUSE SUCH NINE VERDICTS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. FIFTH AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.

{¶ 68} In these assignments of error, Roy argues that the majority of the rape convictions were premised on Harman's testimony and State's Exhibit 3, which he argues were inadmissible. Therefore, any convictions based solely on that evidence were not supported by the weight of the evidence. Roy goes on to argue that the remaining evidence in support of his convictions—the testimony of Anne and Nora—did not support those convictions and were against the weight of the evidence. We will address these arguments in more detail below.

## 1. Standard of Review – Manifest Weight of the Evidence

{¶ 69} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the

reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶ 70} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney*, 12th Dist. Clinton No. CA2020-06-007, 2021-Ohio-466, ¶ 15.

## 2. Analysis

{¶ 71} The jury found Roy guilty of all nine counts of rape of Bailey, as proscribed by R.C. 2907.02(A)(1)(b). That statute provides that,

> No person shall engage in sexual conduct with another * * * when any of the following applies:
>
> (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

{¶ 72} The definition of "sexual conduct" includes, among other acts not relevant here, "vaginal intercourse between a male and female[,]" and "fellatio." R.C. 2907.01(A).

{¶ 73} In support of his second assignment of error, Roy argues that the admission of Harman's testimony about Bailey's statements during the Mayerson Center interview and State's Exhibit 3 was not harmless error because the nine rape convictions were supported by "almost nothing to prove sexual conduct" in the absence of this allegedly inadmissible evidence. But we can easily dispense with this argument because, as set forth in response

to Roy's first assignment of error, Harman's testimony about Bailey's statements and State's Exhibit 3 *were*, in fact, admissible at trial. As a result, the admission of that evidence was not error at all, and Roy's argument that the admission of the evidence was not harmless error is moot. *See In re J.W.*, 12th Dist. Butler Nos. CA2004-02-036 and CA2004-03-061, 2004-Ohio-7139, ¶ 24 (finding an argument moot that was resolved in an earlier assignment of error moot).

{¶ 74} In support of his third assignment of error, Roy argues that the "sole evidence" supporting "most" of the nine counts of rape was Harman's testimony and State's Exhibit 3. But because Roy bases this argument too on the erroneous assumption that Harman's testimony about Bailey's statements and State's Exhibit 3 were inadmissible, and we have found that evidence to have been admissible, this argument is unavailing.

{¶ 75} Roy also argues that "the only other state's evidence was the testimony of [Nora]" but Nora did not know how old Bailey was when she saw Roy with Bailey. Roy argues that it is "impossible to determine" which of the counts the jury may have found were supported by Nora's testimony. As to Anne's testimony, Roy claims that Anne only testified that Bailey engaged in acts of sexual contact with Roy, not sexual conduct.

{¶ 76} The trial record reveals the following evidence concerning the nine counts of rape.

{¶ 77} Harman testified that Bailey disclosed that Roy had penetrated her vaginally and orally with his penis at different locations in and around the Burson property. These locations were the front porch, the barns, and the creek. According to State's Exhibit 3, Bailey disclosed to Harman that Roy took her to the barns more than one time "and did stuff."

{¶ 78} Contrary to Roy's argument, Anne did not merely testify as to acts of sexual contact between Bailey and Roy. Rather, she testified to observing Roy with Bailey in

scenarios that indicated that Roy was engaged in acts of sexual conduct with Bailey. That is, common sense dictates that an adult male, observed alone, with a ten- or eleven-year-old girl, on top of her, and in various states of undress, is consistent with an observation of rape. Anne's testimony corroborated Bailey's statements to Harman of rape occurring on the front porch and in two outbuildings.

{¶ 79} Specifically, Anne testified that one time Linda Burson told her to find out what Roy and Bailey were doing on the porch because they had been "out there for so long." Anne stated she moved out onto the porch and saw Roy and Bailey on a mattress and they were "quite close." It did not look right; Bailey appeared uncomfortable. Anne described Roy as "toppling" Bailey. Anne thought Bailey could have been under the age of 10 at the time of this observation.

{¶ 80} Anne also testified that on another occasion she went into what she called the laundry barn. She went in and saw that Roy and Bailey were standing but Roy was "on top" of Bailey. Anne stated, "It looked like he didn't exactly have his pants on." Anne stated that Roy reacted to her presence in a manner as if this was "something I shouldn't have seen." She had seen him with Bailey "in that manner" "multiple times, in multiple different spots." When asked if Bailey was under the age of 10 at the time, Anne responded, "I'd say it probably happened a lot more than just being under the age of 10." In a follow up question, Anne stated that she believed that Bailey was 10 when they were removed. So, she seemed to be indicating that it occurred to Anne multiple times when she was under the age of 10.

{¶ 81} Anne also stated that she had, on three occasions, observed Roy and Bailey alone in what she called "Roy's barn." Each time "it was the same thing," with Roy "on top of her" and "just like I shouldn't have walked in there and look." [Sic.]

{¶ 82} Anne identified photographs of the "big barn" on the Burson property. Anne

testified that she was the victim of sexual contact in the "big barn" but did not testify to seeing Bailey alone with Roy in the "big barn."

{¶ 83} Anne provided a timeline for when these acts occurred. She testified that caseworkers visited for the first year after she and her siblings moved to the Burson property, around 2016, and that for the next two years, between 2017 and their removal in 2019, she and her sister were subject to physical and sexual abuse perpetrated by the adults in the household. Anne's testimony about inappropriate sexual contact was also corroborated by a school employee who observed hickeys on her neck and reported it to her sixth-grade math teacher, who noted that Anne was absent for several days after the report. School attendance records corroborated this testimony.

{¶ 84} Nora testified that there was a day that "they" were cleaning out the "big barn" on the Burson property. She walked inside the barn and saw Roy on top of Bailey. No one was around other than Roy and Bailey. Bailey was on the ground. He was "leaning over her and had his hands on her wrist." They did not see her. Nora did not tell anyone because she was afraid of Roy. Nora was not sure when this occurred or how old she or Bailey were at the time. But this happened during the time span when she would visit the Burson property and when Anne and Bailey were living at the Burson property.

{¶ 85} Nora also testified to seeing Roy on top of Bailey in the creek. She observed Roy get up quickly and pull his pants up. He had been on his knees and was leaning over Bailey. Bailey was on her back.

{¶ 86} Based on the testimony of Harman, Anne, and Nora, and based on Bailey's statements to Harman, the jury was presented with direct and circumstantial evidence that Roy committed multiple acts of penile-vaginal and penile-oral rape against Bailey at multiple locations on the Burson property, including all three outbuildings, during the time frames set out in the indictments. While our analysis of Roy's manifest weight arguments would have

been easier if the state had elaborated more specifically during its closing argument regarding which evidence supported which count, upon our review of the evidence we are satisfied that the state offered evidence in support of all nine counts at issue.

{¶ 87} Specifically, Counts One and Two (alleging unspecified sexual conduct) are supported by Harman's testimony that Bailey disclosed incidents of penile-vaginal and penile-oral rape that occurred on the Burson property front porch and Anne's testimony that she observed Bailey on the front porch with Roy when Bailey was under ten years of age.

{¶ 88} Count Three (alleging unspecific sexual conduct) is supported by Harman's testimony that Bailey disclosed penile-vaginal and penile-oral rape that occurred in the barns on the property and Anne's testimony that she saw Roy with Bailey in the "laundry barn" when Bailey was under ten years of age.

{¶ 89} Counts Four (alleging unspecified sexual conduct) and Nine (alleging fellatio) are supported by Harman's testimony that Bailey disclosed penile-vaginal and penile-oral rape that occurred in the barns on the property and Nora's testimony of seeing Roy on top of Bailey in the "big barn" during the time period that Nora visited the Burson property.

{¶ 90} Counts Five and Six (alleging fellatio and vaginal intercourse, respectively) are supported by Harman's testimony that Bailey disclosed penile-vaginal and penile-oral rape that occurred in the barns on the property and Anne's testimony of seeing Roy on top of Brittany three times in Roy's barn.

{¶ 91} Finally, Counts Seven and Eight (alleging fellatio and vaginal intercourse, respectively) are supported by Harman's testimony that Bailey disclosed penile-vaginal and penile-oral rape that occurred at the creek, and Nora's testimony about seeing Roy on top of Bailey at the creek.

{¶ 92} Based upon our review of the record, this is not one of the exceptional cases where the jury lost its way. The weight of the evidence supported Roy's convictions on all

nine counts of rape. We overrule Roy's second and third assignments of error.

## C. Imposition of Appointed Counsel Fees

{¶ 93} Roy's fourth assignment of error states:

THE TRIAL COURT ERRED IN IMPOSING APPOINTED COUNSEL FEES OF $250 AS COSTS.

{¶ 94} Roy argues that the trial court erred by ordering Roy to pay appointed counsel fees as part of his sentence when a statute provides that such fees cannot be taxed as part of court costs. The state concedes that the trial court's sentencing entry did not specifically note that appointed counsel fees were a civil assessment, as opposed to part of the sentence itself. The state recommends that we remand the matter to the trial court to include the civil assessment of the court-appointed fees in a separate entry, apart from the sentence.

{¶ 95} R.C. 2941.51 governs the payment of fees to attorneys appointed to a case or selected by an indigent person. R.C. 2941.5(D) provides,

The fees and expenses approved by the court under this section *shall not be taxed as part of the costs* and shall be paid by the county. However, if the person represented has, or reasonably may be expected to have, the means to meet some part of the cost of the services rendered to the person, the person shall pay the county an amount that the person reasonably can be expected to pay. * * *. (Emphasis added.)

{¶ 96} In construing R.C. 2941.51, the Ohio Supreme Court has held,

while such fees may be assessed at the sentencing hearing, they cannot be included as a part of the offender's sentence. Though, if the assessment of the fees is included in the sentencing entry, the court must note that the assessment of the court-appointed-counsel fees is a civil assessment and is not part of the defendant's sentence. To avoid confusion, the best practice would be to include the order in a separate entry, apart from the sentence.

*State v. Taylor*, 163 Ohio St.3d 508, 2020-Ohio-6786, ¶ 37.

{¶ 97} The trial court's sentencing entry in this case imposed the following sentence

on Count One of the indictment:

- ❖ **Mandatory** confinement of **Life in Prison without Parole** in the Ohio Department of Corrections.

- ❖ Court costs.

- ❖ Appointed counsel fees of $250.00.

{¶ 98} Contrary to *Taylor*, the trial court did not note that the assessment of appointed-counsel fees was a civil assessment and was not part of Roy's sentence. Accordingly, we agree that the trial court erred with respect to this aspect of Roy's sentence.

{¶ 99} In lieu of remanding this matter to the trial court as requested by the state, we choose to modify the sentence as permitted under R.C. 2953.08(G)(2). We delete the portion of the judgment entry stating, "Appointed counsel fees of $250.00" and replace with the following language:

> Appointed counsel fees of $250.00, which are not part of the defendant's sentence but are separately imposed as a civil assessment consistent with R.C. 2941.51.

{¶ 100} We sustain Roy's fourth assignment of error and modify his sentence in accordance with this opinion.

{¶ 101} Sentence modified. In all other respects, the judgment is affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.